IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 11, 2012

IN RE EMILY C. R.[1]

Appeal from the Juvenile Court for Wilson County
No. 6211    Charles B. Tatum, Judge

No. M2010-02199-COA-R3-PT - Filed October 16, 2012

Grandparents of a minor child who had raised the child since her birth, filed a petition to terminate the parental rights of the child's Mother. The trial court held that the Mother had abandoned the child by failing to visit and failing to support her and that termination of Mother's rights was in the child's best interest. Mother appeals; finding no error, we affirm the decision of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., M. S., and FRANK G. CLEMENT, Jr., J., joined.

Lisa A. Tomlinson, Lebanon, Tennessee, for the Appellant, Catherine N.

Amanda G. Crowell, Lebanon, Tennessee, for the Appellees, Jeffrey R. and Nancy R.

OPINION

Emily C. R., the child at issue in this case, was born to Catherine N. ("Mother") on December 5, 2005, when Mother was fifteen years of age; shortly after Emily's birth, Mother's parents, Jeffrey R. and Nancy R. ("Grandparents") filed a petition in Wilson County Juvenile Court seeking to be named primary legal guardians of Emily. The petition asserted, *inter alia*, that Mother lived with Grandparents, that Mother was "without sufficient means" to care for Emily, and that Mother was "both physically and financially unable to provide for the care, maintenance and support" of Emily. On December 21, the court entered

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

an Agreed Order between Mother and Grandparents whereby Grandparents were appointed primary legal guardians of Emily.[2]

Grandparents instituted the proceeding giving rise to this appeal on February 9, 2009 by filing a petition seeking to be named permanent guardians of Emily; they amended the petition on June 1 to seek termination of the Mother's parental rights as well as those of the unknown father on the ground of abandonment.

On June 5, 2009 Mother filed a petition seeking to be awarded custody of Emily *pendente lite* and to have permanent custody of Emily restored to her. In the petition Mother asserted, *inter alia*, that she was married on February 21, 2008, that she and her husband had a child seven moths old, and that she was able to care for Emily and meet her needs. On June 15 Mother also filed a document styled *Pendente Lite* Motion For Temporary Change Of Custody Or In The Alternative A Motion To Set For Hearing.

On August 13 Grandparents filed a Second Amended Petition for Termination of Parental Rights or in the Alternative Permanent Guardianship, seeking to be allowed to adopt Emily.

Trial was held on November 4 , November 13, and December 11, 2009, and February 5, 2010;[3] on August 31, 2010, the court entered an order terminating the parental rights of Mother and the unknown father on the ground of abandonment as defined by Tenn. Code Ann. §§ 36-1-102(1)(A)(i) and 113(g)(1).

Mother appeals, raising the following issues:

> I. Whether the trial court's failure in its final order either to terminate the mother's parental rights or, alternatively, to appoint the grandparents as permanent legal guardians for the child, as well as its failure to expressly set forth its findings of fact and conclusions of law, enumerated as such, requires remand.
>
> II. Whether clear and convincing evidence exists to support a finding that the mother abandoned the child by willful failure to visit.

---

[2] Emily's father was not a party to the original proceeding; the Petition alleged that Grandparents were "without sufficient information" relative to him.

[3] The opening statements of counsel for the parties were not transcribed and the record does not contain a pre-trial order defining the issues for the trial; it is apparent from the testimony and proceedings that the hearing encompassed both Grandparents' and Mother's petitions.

III. Whether clear and convincing evidence exists to support a finding that the mother abandoned the child by willful failure to support.

IV. Whether clear and convincing evidence exists to support a finding that termination of the mother's parental rights is in the child's best interest.

## DISCUSSION

Parental termination proceedings are governed by statute and involve a two-step process. *See* Tenn. Code Ann. § 36-1-113. First, a party seeking to terminate the parental rights of a biological parent must prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Second, the party must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the fundamental nature of the parent's rights, courts require a higher standard of proof in deciding termination cases. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

In accordance with Tenn. R. App. P. 13(d), we review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. In cases of parental termination, we determine whether the facts, either as found by the trial court, or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). Whether a ground for termination has been proven by clear and convincing evidence is a question of law, which we review *de novo*, with no presumption of correctness. *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *4 (Tenn. Ct. App. Apr. 30, 2008) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 548)).

A. ABANDONMENT

Tenn. Code Ann. § 36-1-113(g)(1) provides that abandonment, as defined at Tenn. Code Ann. § 36-1-102, is a ground to terminate parental rights; the latter statute provides in pertinent part:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102.

1. Abandonment by failure to visit

Mother contends that the December 21, 2005 order naming Grandparents as Emily's guardians "made no provision for visitation rights for the mother", that the order was still in effect in the four months preceding the filing of the amended petition and that, as a consequence, any failure to visit was not wilful. She also contends that her visitation efforts were "continuously thwarted by the grandparents and other circumstances beyond her reasonable control, and, thus, were not willful."

We disagree with Mother's contention that any failure of her to visit Emily was not wilful because the December 21, 2005 order did not specifically provide for visitation. The order provides in pertinent part the following:

It is, therefore, ORDERED, ADJUDGED AND DECREED, that Petitioners [Grandparents] be the primary legal guardians of minor child [Emily] pending further orders of this Honorable Court.

Mother correctly points out that the order does not specifically provide for visitation; the order says nothing with regard to visitation. The record shows that in June 2008, Mother filed a petition to establish visitation; an agreed order was entered continuing a hearing on the motion indefinitely. Having abandoned her effort to secure visitation by seeking relief

-4-

from the court, as contemplated by the order, Mother's argument in this regard rings hollow. Moreover, there was testimony that Mother visited Emily on some occasions after entry of the order and after Mother moved from Grandparents' home.[4]

The evidence with respect to Mother's contention that her efforts to visit Emily were thwarted by Grandparents was conflicting. Mother testified:

Q. Did you get to see more or less of Emily subsequent to the petition for visitation?

* * *

A. No. It was completely cut off during that, because they were saying that I never asked them for the things that I asked for in my petition. So they said basically that we could work something out if I dropped the petition. So until they had confirmation from their attorney that it was dropped, then I couldn't see her.

* * *

Q. So once this agreed order to continue indefinitely your petition for visitation, were you allowed to see Emily more after that?

A. Not more. It was like when it was convenient for them. If I asked it was yes or no based on what they were doing. And there was nothing set up after that. Like, the every Sunday was cut out and then it was just kind of like if it was convenient, sure; if not, no.

Q. Were you ever allowed from that point to take Emily overnight or to McDonald's?

A. No.

Q. To this day, have you been allowed to take Emily?

A. No, never.

Q. Okay. Then we had Thanksgiving and we already talked about that, and you said that was the time you were accused of texting throughout the meal; is that correct?

A. Yes.

Q. And then we have Christmas, but you were visiting in between those times; is that correct?

A. Yes. Just a couple of times because Christmas and Thanksgiving is a month apart, so just maybe once or twice.

Q. This was in '08, and you were asking for visitation?

A. Yes.

_____

[4] When the order was first entered, Mother was living with Grandparents; she got married and moved from Grandparents' home in February 2008.

\* \* \*

Q.  Then in March, between Christmas and March when K.J. went into the hospital with his diaper rash, were you still calling and asking for visits?
A.  Yes.
Q.  Frequently?
A.  Yes, all the time because I always wanted Emily and K.J. together.  I always wanted to have them together, and it was not - - like, it wasn't - - I was never - - it was very rarely I was ever allowed to go over there.

Grandmother testified that, shortly after Mother moved out, Grandmother set a schedule whereby Mother could visit Emily each Sunday and speak with her by phone on Wednesdays; Grandmother began to keep a log of matters related to Emily, specifically including each of Mother's visits with and calls to her.  Testifying from her log, she recounted each contact Mother had with Emily on a monthly basis beginning in March 2008.  Grandmother testified that through July of 2008 Mother called and visited with Emily; that on July 11, Mother called Grandmother to report that Mother had caught her husband "cheating on her"; that there were no calls or visits in August or September; that Mother's son K.J., was born in October; and that there was considerable confusion and conflict between the families for various reasons during November and December of 2008 and into 2009.  With specific reference to Mother's assertion that visits were cut off, Grandmother testified:

Q.  Did you ever tell her she couldn't visit her or couldn't call any more?
A.  Absolutely not.
Q.  She just quit calling and quit coming?
A.  No.
Q.  She wasn't calling you, asking you to see Emily?
A.  No.  We always wondered why she never wanted to start the visitations back.  My husband and I talked about that.  When she and Ruth Murphy decided to serve us with those papers back when we talked about when we got the certified letter - - and my husband can testify to what he said to her.  When she made that phone call, she never asked us for unsupervised visitation.  She never even communicated with us about that.  She just went to Ruth and we got this letter.

      And so then - - after then, she started calling.  She calls every time she wants to talk to me or wants something, to fix her car or this or that or the other.  But she never called to start back visitation with her daughter.  My husband and I always wondered, but we were not going to innate [sic] that because we wanted to see if she really cared.

-6-

Grandmother testified that between February and June of 2009 Mother had no phone calls with Emily and that Mother's only visits were on April 6 for five hours and on May 10 for 45 minutes.

Grandfather likewise testified regarding Mother's efforts to visit Emily at the hearing on December 11, 2009:

Q. Okay. Before these petitions were filed, when you-all were having some visitation by agreement, you were the one who took - -
A. Yes, ma'am.
Q. - - Emily to the - -
A. Yes, ma'am.
* * *
Q. And did she ever express to you when you were having these visitations by agreement that she didn't like the schedule, that she didn't like that she wasn't getting to see Emily enough or any displeasure at all.
A. No.
Q. Okay. And she also alleged in her petition that you threatened her when she was pregnant with her second child and told her that if she did not separate from her husband, she would not be permitted to see her daughter, Emily, ever again?
A. Never said such a thing. Now, I will go one step further in some of that. When she filed a motion - - let me get the years right - - 2000 - - let's see. We're in '09 - - '08 she filed a petition. And once you file a petition with me, we're not family anymore, we're litigants, which is where we are now.

So when she filed a motion to have custody of Emily or additional visitations, I informed her that she's the one who filed the motion, she went to court and got the courts involved, so we'll let the courts decide. Once she dropped that motion, she was free to talk to Emily again.

But once again, I'm not going to have interaction with her now. We're litigants. We're not family, we're litigants.
Q. Okay. And she alleges that after she dismissed that petition to establish visitation last Summer, that you still did not let her visit with Emily until November or December of 2008.
A. Not true; that was her choice not mine.
Q. Has [Mother] ever provided any type of financial support for Emily?
A. No, ma'am.
Q. And you allege in your petition that she's only visited twice with Emily since December '08 both times at your home.
A. Yes, ma'am.

* * *

Q. And that she's only had token visitation with the minor child since she left and married [mother's husband] in February of 2008?

A. That's correct.

* * *

Q. And you have never denied her telephone contact with Emily?

A. No. Again, with the exception of the time where she had already filed papers. . . .

The evidence is clear that Mother had tremendous turmoil in her life, particularly the circumstances leading to and surrounding her marriage in February 2008, her relationship with her husband, and the birth of her second child in October 2008. Taken as a whole and in the context of time and circumstance, the preponderance of the evidence does not support Mother's assertions that her efforts to visit Emily were thwarted by Grandparents.

The evidence that Mother visited Emily only twice in the four months preceding the filing of the termination petition is unrefuted. Given the particular facts and circumstances of this case, Mother's failure to visit Emily more than twice in the four month period is clear evidence of abandonment within the meaning of the statute.

2. Abandonment by failure to support

Mother next argues that the evidence does not support the court's holding that Mother abandoned Emily by failing to support her; specifically, she contends that there was no court-ordered duty to support and there is no evidence that she had the capacity to provide support.

In order to constitute "abandonment" by failure to render support, a court must determine that the failure is "willful." *See In Re Swanson,* 2 S.W.3d 180, 184–85 (Tenn. 1999). Failure is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *Tenn. Dep't of Children's Serv. v. Calabretta*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004).

With respect to the issue of Mother's support for Emily, the trial court noted:

The evidence is undisputed that the Mother has never provided any financial support for the minor child. Mother admitted that the few items which have been purchased for the minor child's use are at her home and have never been provided to the minor child for her daily use. The Mother has attempted to defend herself by stating that *the Grandparents have not needed*

*her to provide any support* nor had the Grandparents ever requested any support from her. (Emphasis added). . . .

Mother testified that approximately one year ago she and her husband received an income tax refund of over five thousand dollars ($5,000.00) in lump sum. A portion of this money was given to [Mother's husband's] family and a significant amount was used for cosmetic treatments and other discretionary expenses for the Mother. Mother further testified that she had never provided a birthday or Christmas present to Emily until December 2009. She is currently awaiting another income tax refund for approximately the same amount and has testified that she and [her husband] "have plenty of money." The Mother further testified that while health insurance is available to her husband to cover himself and the family through his employment at McDonald's, her husband has chosen to remain on his mother's policy while Mother has chosen to obtain Tenncare for herself and [her second child]. She admitted that she would rather have the taxpayers provide insurance for her rather than paying for it out of their household income. . . .

The court's holding was consistent with the following testimony of Mother at the February 5, 2010 hearing:

Q. Was there ever any understanding that you would be paying child support?
A. No.
Q. Did they ever tell you that you had to pay so much towards Emily's food or shelter or anything?
A. No. I didn't have a job after foster care. I wasn't allowed to, and I only worked, like, one day a week at my job.
* * *
Q. Okay. You just have told this Court how financially secure you are?
A. Yes.
Q. That you can pay your bills. You have money left over. Money is not a problem anymore?
A. Your're right.
Q. I'm not talking about before you moved out. You have not - - since you have been working, you have not provided any financial support for Emily, have you?
A. No, I wasn't asked to.
Q. And then I ask you to state the name and address of each and every employer since February 22, 2008, your job title, the description of the job duties performed, your both annual income or hourly rate of pay, the name and phone number of each and every immediate supervisor, the dates upon which

you were employed at each such place of employment and the reason for leaving the employment, and also to provide your current work schedule.

You answered that December of 2008 to April of 2009 you worked at Opry Mills Mall at Body Central and made $7.25 an hour. And you left because you were not getting enough hours of work. You then said in May of 2009 to August of 2009, you worked at Opry Mills Mall at Johnny Rockets. You made $2.13 per hour plus tips, and you left the job because the business was failing due to economy and you were not making enough money. . . .
***
Q. And then you stated December of 2009 to present, Ruby Tuesday on Donelson Pike, $2.13 plus tips. I've only been working here for one week.

Do you still work at Ruby Tuesdays?

A. No.

Q. When did you leave Ruby Tuesdays?

A. Probably - - I want to say, like, three months ago. I don't remember exactly. But I left - - I was still working there whenever I applied at Arby's. I was just going to get a second job, but they told me that they were hiring first shift manager, and they were giving me the hours that I needed, and so I just left Ruby Tuesdays because it was kind of, you know, it was time consuming that they were already going to give me enough hours as it was.

Q. So now you work at Arby's?

A. Yes.

Q. How much do you make at Arby's?

A. $7.45 an hour.

Q. How many hours do you work?

A. Between 30 to 36.
* * *
Q. And you indicated that you hadn't bought anything for Emily because your parents didn't tell you that she needed anything?

A. Right.
* * *
Q. Okay, And then I asked about any other source of income received by you since February 22, 2008 from sources other than your employment, . . . So you got $5,700 back last year?

A. Well, after they took the - - it was 55.

Q. $5,500?

A. Yes.

Q. You had that in a lump sum check?

A. Yes.

Q. None of that was provided for Emily's support?

-10-

A. No.

Q. Okay. And - -

A. I'm not going to give them any money when I don't know what's going - - whenever I don't trust them and I don't know where it's going to considering they bought a brand new hot tub as soon as I moved out of the house and, you know, got a fountain for their pool and stuff like that.

While there was no court order that Mother provide financial support for Emily, the law is clear that the fact that a parent may not be under an order to pay support is not dispositive of the question of whether the failure is wilful, as the obligation to pay support exists in the absence of a specific order. *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004). The testimony quoted above shows that Mother had the ability to pay but chose, without justifiable excuse, not to contribute to Emily's support. The court properly determined that Mother abandoned Emily by failing to support her.

B. BEST INTEREST

Mother contends that the evidence does not support the court's holding that termination of her parental rights is in Emily's best interest. She asserts that the court "failed to properly credit evidence that [she] has matured from a fifteen-year-old mother into a much more responsible young adult" and that the termination of her rights will "eliminate the mother-daughter relationship . . . [and] . . . irreparably harm the child's relationship with her younger sibling."

The Legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest.[5] The list of factors in the statute is

---

[5] The factors at Tenn. Code Ann. § 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(continued...)

not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of Tenn. Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

As a preliminary matter, we disagree with Mother's argument that the trial court did not make express findings with regard to Emily's best interest; to the contrary, the court discussed the evidence related to Emily's best interest at length with specific reference to the statutory factors.

The court concluded its discussion by stating:

The Grandparents have proven by clear and convincing evidence that the best interests of Emily would be served by the termination of Mother's parental rights so that Emily can be freed for adoption by the Grandparents and continue with the safety and security of the life to which she has become accustomed. The Mother is now nineteen years of age and has been a married woman for almost two years. In spite of this, Mother still clearly lacks enough stability in her marriage, her home, and her occupation to act in the best interests of Emily. Her interaction with Emily for the last four years has constituted a relationship more in line with that of a big sister or an occasional babysitter. Rather than take responsibility for Emily and move into an independent life where she could be her caretaker, she chose instead to abandon Emily to the Grandparents and to leave for a new life with [Mother's husband] and a second child. Termination of Mother's parental rights would serve Emily's best interests, as Emily would continue to live in the only home she has ever known, to be cared for by the only people she has ever known to

---

[5](...continued)
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances or controlled substances analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

meet her day-to-day needs as parental figures, and to blossom into her full potential as a person.

Having reviewed the evidence, we find that the court's determination that termination of Mother's parental rights was in Emily's best interest is supported by clear and convincing evidence and is in accordance with Tenn. Code Ann. § 36-1-113(i).

C. THE TRIAL COURT'S AUGUST 31, 2010 ORDER

Mother raises some measure of concern regarding the trial court's August 31, 2010 order and suggests the following:

This case should be remanded to the trial court to enter judgment either terminating the parental rights of one or both parents, or, alternatively, establishing a permanent guardianship with respect to the child or, alternatively, adopting some other final disposition permitted by law, all after compliance with the statutory requirement that it file written findings of fact and conclusions of law.

Mother does not suggest that this is an "issue" which requires the reversal of the decision.

We have, of course, reviewed the August 31, 2010 order and conclude that it fully satisfies the requirement of Tenn. Code Ann. § 36-1-113(k) that the order "make[s] specific findings of fact and conclusions of law." There is no particular format required to comply with the statute and the court in this instance made its findings and conclusions in narrative fashion. This concern is without merit.

It is equally clear that, in the order, the court disposed of the issues raised in Grandparents' petitions as well as Mother's. Given the unique procedural posture presented by the history of this case, we find no fault with the manner in which the court disposed of the competing petitions. The court determined that the parental rights of both Mother and Father should be terminated on the grounds of abandonment; that mother had not met her burden of showing "a substantial and material change of circumstance" such that custody of Emily should be returned to her; and that "[s]hould the order terminating parental rights be reversed, the Grandparents have clearly and convincingly established that they should be Emily's permanent guardians."

D. Conclusion

For the foregoing reasons, we affirm the Order terminating Mother's parental rights. The case is remanded to the trial court for further proceedings in accordance with this opinion.

_____

RICHARD H. DINKINS, JUDGE