IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 19, 2003 Session

## IN RE J.J.C., D.M.C., AND S.J.B. A/K/A K.

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
## JOHN CALABRETTA

**An Appeal from the Juvenile Court for Shelby County**
**No. M2432     Harold W. Horne, Referee**

---

**No. W2002-01400-COA-R3-JV - Filed January 23, 2004**

---

This is a termination of parental rights case. While the father was incarcerated for driving offenses, the mother was arrested for possession of drug paraphernalia. As a result, the parties' two young children were placed in state custody. When the father was released from prison, he contacted the state to enter into a plan of permanency. Subsequently, the state filed a petition to terminate the parental rights of both the mother and the father, alleging that they had failed to comply with the permanency plan, and that they abandoned the children by willfully failing to pay child support to the state. Almost a year later, the trial court conducted a trial in the matter. After the trial, the trial court entered an order terminating the parental rights of both the mother and the father. The father's parental rights were terminated based, in part, upon abandonment. Only the father has appealed from the trial court's decision. We reverse, finding that the evidence does not establish by clear and convincing evidence that the father's failure to make support payments was willful.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is**
**Reversed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, John Calabretta.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

Respondent/Appellant John Calabretta ("Father") and Linda Ann Bowers ("Mother") had lived together as an unmarried couple for seventeen years at the time of trial. Father and Mother are the natural parents of the two children involved in this appeal, D.M.C., born December 9, 1997, and J.J.C., born November 23, 1995.[1] Another child was also involved in the petition, S.J.B., born on July 8, 1999, whose natural parents are Mother and J. Maxwell Karam ("Karam").

In March, 1998, Father was incarcerated for being an habitual motor vehicle offender. On April 17, 1998, while Father was still incarcerated, Mother was arrested for possession of drug paraphernalia. As a result, D.M.C. and J.J.C. were placed into protective custody by the Department of Children's Services ("DCS"). When Mother was arrested, there were no utilities in her home and very little food. J.J.C. was suffering from an eye infection, and DCS later discovered that she had tested positive for cocaine at birth.

On May 20, 1998, D.M.C.. and J.J.C. were found to be dependent and neglected. Father was released from prison in June1999. When S.J.B. was born on July 8, 1999, the baby tested positive for cocaine. Consequently, on July 16, 1999, S.J.B. was placed into protective custody by DCS in the same foster family as D.M.C. and J.J.C. On August 25, 1999, S.J.B. was also found to be dependent and neglected.

DCS developed permanency plans for the children, that is, plans of care setting forth what Mother and Father would need to do to regain custody. These plans were presented on June 22, 1998, while Father was still incarcerated. According to the June1998 plans, Mother was required to maintain contact with DCS, get therapy for her drug problem by attending an in-patient detoxification program and weekly meetings for cocaine abusers, and get stable housing. Father's sole responsibility was to contact DCS and the juvenile court to make plans for the children's future. The plans also provided that Father and Mother were "[t]o pay child support if ordered by the courts." Mother signed those plans, but Father did not.

On September 20, 1999, after S.J.B. was born and taken into protective custody, an updated set of permanency plans was developed. The updated set of permanency plans included many of the same requirements for Mother and added the requirement that she attend parenting classes. Though both Mother and Father signed the updated permanency plans, the plans contained no responsibilities for Father. On August 2, 2000, a third set of permanency plans was developed. These plans included the same requirements for Mother, but also required Father to attend parenting classes and "submit to periodic; [sic] random alcohol test[s] to prove sobriety." Neither Mother nor Father signed the August 2000 set of plans.

---

[1] The couple also has two other children who were not living with them and who were placed with their godparents. The parental rights as to those two children are not at issue in this appeal.

On March 11, 2001, Father was imprisoned for another motor vehicle violation. The next day, on March 12, 2001, DCS filed the petition below to terminate the parental rights of Father, Mother, and Karam as to the three children, D.M.C., J.J.C., and S.J.B. With respect to Mother, the petition asserted as grounds for termination the existence of persistent conditions preventing the children from safely returning to Mother's custody. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A) (Supp. 2003). As grounds for the termination of Father's parental rights, the petition asserted that Father had abandoned D.M.C. and J.J.C., based on Father's failure to pay support or seek reasonable visitation. *See* Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2003). The petition alleged that all three respondents had failed to comply with the DCS permanency plans. Later, DCS amended its petition to allege that all of the respondents had willfully abandoned the children by failing to pay support or to visit, and alleging persistent conditions preventing the safe return of the children to their custody. Karam did not respond to the petition, and on May 23, 2001, the trial court entered a default judgment against him, ordering the termination of his parental rights as to S.J.B. Karam did not appeal that order, and his parental rights are not at issue in this case.

On February 11, 2002, the trial court conducted a trial on DCS's petition to terminate the parental rights of Father and Mother. The record on appeal contains two separate statements of the evidence, both approved by the trial court, as well as a partial transcript of the evidence.[2] At the trial, evidence was submitted to show that the DCS case worker discussed with Father and Mother the need for both parents to demonstrate sobriety, complete parenting classes, and obtain stable housing before the children could be restored to their custody. The record does not include evidence that the parties were told that they were obligated to pay child support, or that failure to pay child support could result in the termination of their parental rights. The record indicated that Father and Mother obtained stable housing by moving into a house that had been devised to Mother. However, the DCS case worker testified that Mother never provided DCS with evidence that she had successfully completed an alcohol or drug treatment program, completed parenting classes, or obtained employment. The case worker later modified her assertion by acknowledging that Father and Mother completed parenting classes in late 2001, after the petition for termination had been filed. The case worker testified that Father attended eight of ten scheduled visits in 2000, and attended two of five scheduled visits between January and October 2001. All of the visits were supervised by DCS. The case worker said that neither Father nor Mother had paid any child support to DCS during the entire time the children were in foster care. At most, Mother and Father occasionally brought small gifts and snacks for the children during their visits. The case worker indicated that D.M.C., J.J.C., and S.J.B. remained in the foster home in which they were originally placed in March 1998 and July 1999, respectively, and that the foster parents had expressed an interest in adopting the children.

Father testified as well. He said that he had satisfied the requirements of the permanency plans. He noted that, at one point, he was asked to submit to a drug test, and that he submitted to the drug test but was never told the result of the test. He admitted that he had used drugs in the past, remarking that he had not used marijuana "in quite a while," but acknowledged that he had used

---

[2]The lack of a full transcript of the trial court proceedings was apparently due to defective audio recording and was not attributable to the fault of either party.

cocaine on one occasion a month prior to the trial. Father maintained that he did not have a drug problem, but admitted to having used drugs while the children were in the house. Father explained that he and Mother did not do drugs around the children, but waited to do so until the children were asleep. He admitted that he did not "consider it appropriate, but it was better to do it there than try to go out on the streets and do it and have somebody baby sit and go somewhere else to do it."

Father acknowledged that during the time the children were in DCS custody he did not make any payments to DCS for their support. He noted, however, that from November 3, 1998, to January 4, 1999, while he was in prison, he sent Mother six checks totaling $939.50 earned from a work release program for the support of Mother and the children. Father testified that, although he sent no money to DCS, he bought the children gifts and food and other things while they were in foster care. When he was not in jail, Father testified that he was self-employed, making anywhere from $20 to $100 a day "scrapping."[3] He estimated that he made about $14,000 in 2001 from scrapping. Father testified that DCS had never told him that he was required to make support payments to DCS while the children were in DCS custody. The evidence at trial showed that the June 1998 parenting plan, not signed by Father but signed by Mother, stated that child support was to be paid by the parents "if ordered by the courts." The September 1999 parenting plan, which was the only plan signed by Father, addressed child support by inquiring:

> a. Is there a current order of child support through the child support division? Answer: No.
>
> b. If no, has the court ordered support as part of the custody order? Answer: No.
>
> c. If there was no court order and support was not part of the custody order did DCS petition for support? No answer.

The third plan, signed by neither Mother nor Father, indicated merely that there was no current order of child support issued through DCS.

At the conclusion of trial, the trial court issued an oral ruling terminating the parental rights of both Father and Mother. On April 18, 2002, the trial court entered an order consistent with its oral ruling, terminating Mother's parental rights with respect to all three children at issue, and terminating Father's parental rights with respect to D.M.C. and J.J.C. The trial court concluded that DCS had established, by clear and convincing evidence, that Father had abandoned the children under the definition of that term in Tennessee Code Annotated § 36-1-102(1)(A). It found, as well, that both Father and Mother had failed to comply substantially with the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2003). The trial court also found that termination of Father's and Mother's parental rights was in the best interest of the children. Thus, finding clear and convincing

---

[3] According to Father, "scrapping" is collecting metal off the streets and from body shops and hauling it to a scrap yard or a recycling facility in exchange for money.

evidence to support its decision, the trial court terminated the parental rights of both Father and Mother under Tennessee Code Annotated § 36-1-113(c). Only Father has appealed from that order.

On appeal, Father argues that the evidence was not sufficiently clear and convincing to show that he abandoned the children by willfully failing to support them within the four months preceding his incarceration. He concedes that he paid no money to DCS while the children were in foster care. He claims, however, that his failure to make such payments was not willful. He points out that when the children were taken into DCS custody, DCS never contacted him in prison to tell him that he was expected to pay child support. He asserts that the $939.50 he sent Mother from jail was intended, in part, for the children. Had he been informed that he was expected to pay support to DCS, Father argues, he could have paid it out of his earnings. Father also challenges the trial court's determination that he failed to comply with the DCS permanency plans.

On appeal, DCS does not challenge Father's argument that he complied with the permanency plans, conceding that there was not clear and convincing evidence to establish that he failed to do so. DCS argues, however, that the evidence was sufficient to show that Father had abandoned the children by failing to make anything more than token support payments in the four months preceding his incarceration. *See* Tenn. Code Ann. § 36-1-102(1)(A), (B), and (D) (Supp. 2003). DCS points out that Tennessee courts have found that the evidence establishes willful failure to support even when there is no court order requiring the payment of support. Although the trial court did not address the ground of persistent conditions as it related to Father, DCS argues, this court should terminate Father's parental rights based on the ground that persistent conditions exist to prevent the safe return of the children to Father's custody.

Under Tennessee Code Annotated § 36-1-113(c), a parent's rights may be terminated based on the following:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
>
> (2) That the termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c) (Supp. 2003). Because the decision to terminate parental rights involves fundamental constitutional rights, both elements of section 36-1-113(c) must be proven by clear and convincing evidence. *See In re C.M.R.*, No. M2001-00638-COA-R3-JV, 2002 WL 192562 at *3 (Tenn. Ct. App. Feb. 7, 2002). The clear and convincing standard in termination cases is more than a "preponderance of the evidence" but less stringent than a "beyond reasonable doubt" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). Clear and convincing evidence "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *Id*. Considering this heightened standard, we review the trial court's findings of fact *de novo* on the record, with a presumption that the trial court's factual findings are correct. Tenn. R. Civ. P. 13(d); *see In re C.M.R.*, 2001 WL 192562, at *3; *In re*

*Copeland (Graham v. Copeland)*, 43 S.W.3d 483, 485 (Tenn. Ct. App. 2000); *Tennessee Dep't of Human Servs. v. Riley*, 689 S.W.2d 164, 170 (Tenn. Ct. App. 1984). The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. *Copeland*, 43 S.W.3d at 485.

The enumerated grounds for termination are found in section 36-1-113(g) of the Tennessee Code Annotated. A decision to terminate parental rights may be based on any one of the grounds enumerated in the statute. *See In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). The two grounds for termination relevant to this appeal are (1) abandonment and (2) persistent conditions preventing the likelihood of the children's safe return to Father's home.

Tennessee Code Annotated § 36-1-113(g)(1) provides that the termination of parental rights can be based on abandonment as the term is defined in section 36-1-102. As it applies to this case, abandonment is a parent's willful failure to pay more than token support in the four months preceding the filing of the petition to terminate parental rights, or, if the parent is incarcerated when the petition is filed, in the four months preceding incarceration.[4] *See* Tenn. Code Ann. § 36-1-102(1)(A), (B), (D) (Supp. 2003). The obligation to pay support exists even in the absence of a court order to do so. *See State v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997) ("The statute does not require the parent to first be placed under a court order."); *see also In re Gordon (Webb v. Wilson)*, 980 S.W.2d 372, 373-78 (Tenn. Ct. App. 1998).

Father admits that he made no payments to DCS for the support of the children during the entire time they were in DCS custody. Father argues, however, that, under the circumstances, his failure to pay child support cannot be found to have been willful. He claims that he was not aware of his obligation to pay child support. Though ignorance of this obligation may not be a sufficient reason for failure to pay in some cases, Father argues that his case is unique because the permanency plans implied that he was obligated to make support payments only if there was a court order requiring him to do so. Thus, he asserts that he was led to believe that support payments were not necessary to get his children placed back into his home. In response, DCS argues that, given the fact that Father's annual income is approximately $14,000 and that he has minimal living expenses, his failure to pay support must be deemed willful, and Father cannot excuse his failure to pay based on the lack of a court order to do so.

In order to safeguard a parent's fundamental right to the care and custody of his child, parental rights may not be terminated based on abandonment for failure to support unless clear and convincing evidence shows that the parent's failure to make reasonable payments toward the support of his child was willful. *See In re Swanson*, 2 S.W.3d 180, 184-85 (Tenn. 1999). Requiring a showing that the failure to support the child was willful allows "for the type of individualized decision-making which must take place when a fundamental right is at stake." *Id.* at 188. The issue,

---

[4] Abandonment can also be established by showing a parent's failure to visit the child within the four months preceding the petition or the parent's incarceration, if applicable. *See* Tenn. Code Ann. § 36-1-102(1)(A), (C), (E) (Supp. 2003). In this case, DCS concedes that clear and convincing evidence did not establish the Father willfully failed to visit the children during the pertinent time period. Thus, to establish abandonment, DCS relies solely on Father's failure to pay support.

then, is whether Father's failure to make any meaningful support payments within the four months preceding his incarceration was "willful."

Failure of a parent to pay support under the termination statutes is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." ***In re Adoption of Muir***, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003) (citing cases from other jurisdictions). "The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. . . . Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct." ***Id.***

In this case, the evidence of Father's conduct after the children were taken into DCS custody was essentially undisputed. While Father was incarcerated during the first year the children were in DCS custody, Father sent Mother money he earned on work release for the needs of Mother and the children.[5] When Father was released from jail, he contacted DCS to discuss his plans with respect to the children. The record includes no evidence that DCS explained to Father that he was obligated to pay support, lest he lose all parental rights to his children. Father continued to visit the children and buy them small gifts and food, but testified that had he been aware of his obligation to pay child support, he would have put the money spent on gifts toward support.

Moreover, the permanency plans not only failed to state that Father was obligated to pay child support, they, in fact, implied that he was not required to do so unless there was a court order of support. The June 1998 plan stated that child support was to be paid "if ordered by the courts." Similarly, the September 1999 and August 2000 parenting plans indicated only that there was no current order of child support entered through the child support division of DCS or the trial court. In its oral ruling at the conclusion of trial, the trial court seemed to acknowledge that the evidence of abandonment was less than overwhelming, remarking, "I'll go ahead and throw it in, for the state's benefit the failure to support. I question whether the Court of Appeals would uphold it on that particular ground, alone, but, will do so here."

Under these circumstances, we cannot conclude that the State established by clear and convincing evidence that Father's failure to pay was willful. We find persuasive the reasoning in ***State v. Demarr***, in which this Court reversed a finding of willful failure to support, because DCS never explained to the mother that her failure to make support payments could result in her losing her child. The ***Demarr*** court reasoned:

> In [the mother's] case, no child support was ever ordered by the court nor was a child
> support obligation placed in either Permanency Plan. DCS provided no monitoring

---

[5]We note that Father's payment of money to Mother, rather than paying money to DCS when the children were in DCS custody, does not satisfy Father's obligation to pay support. It may, however, constitute evidence of Father's intent not to abandon his children.

or assistance for almost a year. There is no evidence in the record that [the mother] was ever requested by DCS to provide any form of support for her child, nor was it ever explained to her that failure to provide support could result in losing her child permanently. DCS continually reiterated the need for her to find a place of her own, regular employment, and childcare, all without offering any assistance. Considering the burdens placed on [mother] by DCS, her limited income, and her lack of understanding of the importance of paying child support to her parental rights, we find no clear and convincing evidence that her failure to pay was willful.

*State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *13 (Tenn. Ct. App. Aug. 13, 2003). In the instant case, DCS understandably focused much of its efforts on Mother, in an attempt to help her rectify her drug problems so that she would be able to take care of the children. In the process, it seems, Father's issues were given considerably less attention. Given the fact that the permanency plans would have led Father to believe that support payments were required only if a court ordered such payments, Father's failure to pay cannot be considered to have been willful. Therefore, the trial court's termination of Father's parental rights on the ground of abandonment must be reversed.

DCS argues that, even if this Court determines that the evidence was insufficient to show abandonment, we should nevertheless affirm the trial court's termination of Father's parental rights based on ground of "persistent conditions." The applicable statute provides that parental rights may be terminated when:

. . . The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

    (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

    (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

    (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A) (Supp. 2003). Although the amended petition of DCS alleged persistent conditions as a ground for the termination of Father's rights, the trial court did not address that ground in its ruling. DCS argues that the undisputed facts in the record establish by clear and

convincing evidence that, as to Father, persistent conditions exist, namely, Father's admitted use of drugs while the children were in the home, and the fact that he continues to live with Mother, an admitted cocaine addict. These are indeed cause for grave concern. It must be noted, however, that the permanency plans do not address drug use by Father. Moreover, there is nothing in the record indicating that Father was informed that his continued cohabitation with Mother, a cocaine addict, would result in the termination of his parental rights. Under these circumstances, it is unclear whether there was sufficient evidence to show that persistent conditions existed with respect to Father. Therefore, we remand the cause to the trial court for a determination regarding whether, with respect to Father, there is clear and convincing evidence that conditions which prevent the children's safe return to Father's custody still persist and are unlikely to be remedied at an early date, and that continuation of Father's relationship with the children greatly diminishes their chances of integration into a safe permanent home. The trial court may, in its discretion, consider further evidence on remand.

The decision of the trial court is reversed, and the cause is remanded for proceedings not inconsistent with this Opinion. Costs on appeal are to be taxed to Appellee State of Tennessee, Department of Children's Services, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE