IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 8, 2012 Assigned on Brief

# IN RE J.C.H., J.C.H., and J.C.H.

**Appeal from the Juvenile Court of Hardin County**
**No. 10-JV-361     Daniel L. Smith, Judge**

**No. W2012-01287-COA-R3-PT - Filed December 14, 2012**

This appeal involves the termination of the parental rights of a mother and father as to their three children. The Tennessee Department of Children's Services became involved after it was reported that the father sexually abused the parties' older daughter. Initially, the children were permitted to stay in the mother's custody under a protection agreement and a restraining order which prohibited the father from any contact with the children. In violation of both, the mother and father fled the state with the children. As a result, the children were taken into protective custody. In the ensuing dependency and neglect proceedings, the children were found to be the victims of severe child abuse by both the father and the mother, and this finding was not appealed. The father eventually pled guilty to attempted aggravated sexual battery of the child. The Department filed this petition to terminate the parental rights of both parents. The trial court found several grounds for termination, including severe child abuse and abandonment by failure to support, and terminated the parental rights of both parents. The mother and father now appeal. We reverse the finding that the father abandoned his children by failure to support, but affirm all other grounds for termination and affirm the termination of the parental rights of both parents.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Reversed in Part and Affirmed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD J., joined.

Lisa M. Miller, Selmer, Tennessee, for Respondent/Appellant B.J.H.

Benjamin S. Harmon, Savannah, Tennessee, for Respondent/Appellant, J.L.H.

Robert E. Cooper, Jr. and Martha A. Campbell, Nashville, Tennessee, for Petitioner/Appellee Tennessee Department of Children's Services.

# OPINION

## FACTS AND PROCEEDINGS BELOW

This appeal involves the termination of parental rights. Respondent/Appellant B.J.H. ("Mother") and Respondent/Appellant J.L.H ("Father") are the married parents of the three children at issue in this appeal: J.C.H. ("older daughter"), born in 1998, J.C.H. ("son"), born in 1999, and J.C.H. ("younger daughter"), born in 2007. The family lived in Savannah, Hardin County, Tennessee, where Father worked at an auction house to support the family, and Mother was a stay-at-home parent.

The Tennessee Department of Children's Services ("DCS") became involved with this family when it received a report that Father had sexually abused the older daughter on the evening of February 28, 2010, and attempted to do so again the next morning. On March 5, 2010, DCS filed a petition in the Juvenile Court of Hardin County, Tennessee to adjudicate the children dependent and neglected by Father. The petition recited that DCS had entered into an Immediate Protection Agreement ("IPA") with Mother, allowing her to maintain custody of the children so long as she did not permit them to have contact with Father and admonishing her not to discuss the details of the abuse with their older daughter.[1] The petition asked the Juvenile Court to issue a restraining order and a no-contact order, prohibiting Father from having any contact with the children and enjoining Mother from allowing any such contact. The Juvenile Court entered an order granting the restraining order and the no-contact order.

On March 11, 2010, in direct violation of the Juvenile Court's orders, Mother and Father fled Tennessee with the children and traveled to North Carolina, for the purpose of giving the children to Mother's brother in that state. As a result, on March 13, 2010, the children were taken into protective custody by DCS. On March 15, 2010, the DCS petition to adjudicate the children dependent and neglected was amended to include Mother's misconduct, and DCS was granted temporary custody.[2] Father was prohibited from having any contact with the children whatsoever, and Mother was granted only supervised visitation. Father was incarcerated on March 15, 2010 and released ten days later, on March 25, 2010.

---

[1] The appellate record does not include a copy of the IPA.

[2] For reasons that do not appear in the record, the order from this preliminary hearing was not entered until April 19, 2010.

The Juvenile Court appointed counsel for both Mother and Father and appointed a guardian ad litem for the children. On March 25, 2010, DCS created a permanency plan for each child.

On May 6, 2010, the Juvenile Court held a hearing on the DCS petition, and later entered an order finding the children to be dependent and neglected based on stipulated facts. The Juvenile Court ordered supervised visitation for both Mother and Father and ordered Mother to participate in counseling and undergo parenting and psychological assessments. The Juvenile Court reserved the issue of whether the children had been subjected to severe abuse by either parent.

In February 2011, Father pled guilty to attempted aggravated sexual battery of the older daughter. He received an eight-year sentence. He was required to serve 18 months of the eight-year sentence, with the remainder on probation, and was placed on the sexual offender registry for his lifetime. Father began serving his incarceration in March 2011.

In an order entered on March 9, 2011,[3] the trial court held that both Mother and Father had subjected all three children to severe child abuse as defined in Tennessee Code Annotated § 37-1-102(23). The order first outlined the facts to which the parties had stipulated:

> [T]he child . . . stated that she has been sexually abused by [Father]. The child stated that the abuse occurred on Sunday night, February 28, 2010, and that he also attempted to abuse her again the next morning. An Immediate Protection Agreement was entered into with [Mother], whereby there was to be no contact between the father and said children pending further investigation. Further, [Mother] was advised not to discuss the details of the abuse with the child. The family home was found to be in disarray with toys, clothing, and other items piled in the floor. There was also an offensive odor inside the residence. [Mother] took said children and left the jurisdiction of this court on or about March 11, 2010. The children have been in close proximity to [Father], in violation of the restraining order and at further risk of harm. Temporary custody of the children . . . was awarded to [DCS] effective March 13, 2010. [Mother] testified that she, the children, and [Father] traveled to North Carolina and that they attempted to give the children to her brother because of the situation that had arisen in Tennessee regarding the allegations of sexual abuse.

---

[3]In this order, the Juvenile Court indicated that it relied on the evidence and stipulated facts presented at the August 6, 2010 hearing, and it is unclear whether a further evidentiary hearing was held.

The order then stated the Juvenile Court's holdings on the issue of severe child abuse by Father in the context of the dependency and neglect proceedings:

> The court finds that [Father] has committed and the children have suffered from abuse and neglect, and said abuse is severe child abuse as defined by Tennessee Code Annotated Section 37-1-102(23). The court finds in addition to the above stipulated findings of fact that on February 28, 2010, [Father] sexually abused his child . . . and the sexual act committed toward his child who was 11 years of age constitutes aggravated sexual battery as defined by Tennessee Code Annotated Section 39-13-504, and also rape of a child as defined by Tennessee Code Annotated Section 39-13-522.

The order then stated the Juvenile Court's holdings on the issue of severe child abuse by Mother:

> The court finds that [Mother] has committed and the children have suffered from abuse and neglect, and said abuse is severe child abuse as defined by Tennessee Code Annotated Section 37-1-102(23). The court finds in addition to the above findings of fact that she knowingly exposed her children to and knowingly failed to protect them from abuse or neglect. [Mother] had knowledge as stated in the Immediate Protection Agreement dated March 2, 2010, that her daughter, . . . , said that [Father] had touched her in a sexual manner. [Mother] agreed to not have [Father] around the children pending further investigation. On or about March 11, 2010, [Mother], the children, and [Father] together fled the jurisdiction of this court in violation of the Immediate Protection Agreement and the restraining order prohibiting [Father] from being around the children. [Mother] violated the Immediate Protection Agreement by discussing the case with [older daughter] prior to her forensic interview, telling her to "quit lying" and that she was tearing up the family. The discussions with [older daughter] were also a knowing failure to protect the child from abuse.

Thus, in the context of the dependency and neglect proceedings, the Juvenile Court held that both Mother and Father committed severe child abuse as to all three children. Neither Mother nor Father appealed this ruling.

After this, at the end of the school year, the children were placed with Mother's brother in North Carolina. Permanency plans were approved that included supervised visitation and telephone calls for Mother. The order ratifying the permanency plans reserved the issue of child support.

The children's placement in North Carolina later proved unworkable. In September 2011, the children were placed back in foster care in Tennessee. In November 2011, the trial court entered an order relieving DCS of the obligation to make reasonable efforts to reunite the children with their parents, in light of the finding of severe child abuse, pursuant to Tennessee Code Annotated § 37-1-166(g)(4)(A).

On January 13, 2012, DCS filed a petition to terminate the parental rights of both Mother and Father. As to both parents, the petition alleged abandonment by failure to visit and failure to support pursuant to Tennessee Code Annotated §§36-1-113(g)(1) and 36-1-102(1)(A)(i), abandonment by failure to provide a suitable home pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii), persistent conditions pursuant to Tennessee Code Annotated § 36-1-113(g)(3), and severe child abuse pursuant to Tennessee Code Annotated §§ 37-1-102 and 36-1-113(g)(4). As to Father, the petition also alleged abandonment by engaging in conduct prior to incarceration that exhibited a wanton disregard for the children, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv). After the petition to terminate was filed, the Juvenile Court appointed new separate counsel for Mother and Father.

The trial on the petition to terminate was held on April 16, 2011. The Juvenile Court heard testimony from both parties, two DCS case workers, and the children's foster parents.

Mother testified at the outset. She said that since the children were taken into protective custody by DCS, she had moved four times. At the time of trial, she was living in an apartment. Her only income came from occasionally cleaning people's houses; she did not make enough money to support herself and her mother was paying her rent.

Mother testified that she visits with the children generally once a month, usually for an hour per visit, and she talks to them by telephone whenever she can. The visits are supervised in light of the finding of severe abuse. Mother was not paying child support for the children, but sent items to the children and brought them items on her visits, such as toys, clothes, and family pictures. Mother testified that, in the four-month period that preceded Father's incarceration, he would give her money to help her maintain a stable home for the children and buy their school supplies and clothes. She stated that Father would give her money for whatever the children requested, specifically clothes, toys, and at one point a watch.

Mother said that she had completed parenting courses and had undergone a mental health assessment. She had received substantial treatment for depression, both in-patient and outpatient, and was taking medication for it. Mother attributed her depression to DCS removing the children from her custody.

In her testimony, Mother characterized her act of absconding to North Carolina with Father and the children as "a mistake," and emphasized that she had repeatedly admitted that it was a mistake. When questioned about Father's sexual abuse of the older daughter, Mother said that she did not see anything that night and did not know what happened. Asked if she acknowledged that Father sexually abused the older daughter, Mother replied: "I'm not saying yes or no. I'm saying flat out I don't know. And that's what I've always said, 'I don't know.'" She claimed that both her husband and her older daughter had told her that the alleged abuse never occurred. Mother denied telling the older daughter that everything was her fault. She commented that the older daughter may have claimed that Mother had said that to her because she "likes to play one side against the other, and sometimes she likes to sit there and keep things stirred up. She's a teenager. They do that . . . . You cannot take one specific instance and make a whole big world out of it."

Mother asserted that the conditions in her home that led to removal of the children from her custody had been remedied because she no longer had a relationship with Father. She said that she last visited him in jail in September or October 2011. She claimed she had not filed for divorce due to her financial situation. Mother explained why termination of her parental rights would not be in the best interest of her children:

> Because you know what? You don't have to sit there and tear families apart like y'all do. Y'all do it to a bunch of people. Y'all tear them apart. Life ain't perfect. It never has been. So why do you have to sit there and yank people's parental rights away instead of living somewhere else for a while and just stay busy? Because the foster parents want to be sit [sic] there and do whatever they want to do with them instead of giving the kids each their own bond of their own family, their own blood. That's why . . . . We was all close. . . . We was a happy family at one time and y'all came in, you ripped it apart and whatever. I done everything y'all have asked me to do every single time. Every single time you guys came up with something new, I done it.

Father also testified. At the time of trial, Father was incarcerated. He acknowledged that he was not at that time in a position to have custody of the children. Prior to becoming incarcerated, Father said, he was employed and financially supported Mother and their children. Father claimed that, after the abuse allegations arose, he continued to provide money to Mother so that "she would be able to keep a roof over her head and clean clothes on her back, food in her stomach and doing the same for the kids." Father said that he provided money to Mother in the four months prior to his incarceration and was never told to pay additional money to either the children's foster parents or to DCS.

Father testified that he participated in the therapeutic visitation offered to him with the parties' two youngest children. He conceded that even when he was not in jail, he did not attend all of the DCS meetings, and said that his attorney advised him not to undergo the mental health assessment required under the permanency plans. Father corroborated Mother's testimony that she had not visited him in jail and said that he intended to divorce her. Asked if he accepted responsibility for the acts that led to the removal of the children from the parties' home, Father responded: "Well, I'll admit I'm not a father-of-the-year candidate, but as far as doing the sexual abuse, no." Father asserted that terminating his parental rights was not in the best interest of his children.

The Juvenile Court also heard testimony from the first DCS case worker assigned to the family, Ginger Daniel. Daniel worked with the children from the time they were taken into DCS protective custody on March 13, 2010 until June 2011. She explained the efforts DCS made for the family in the time period after the children were removed from Mother's custody, including foster care, medical and dental care, the creation of permanency plans, a mental health assessment for Mother, family and parent support services once or twice a week, counseling, and therapeutic visits with both Mother and Father. Daniel said that the most important of the parents' responsibilities under the permanency plan was to provide a safe and stable home for their children, and this was never done by either parent.

To a certain extent, Daniel corroborated Mother's testimony that she complied with numerous requirements in the children's permanency plans, such as parenting support, visiting with the children, and making progress on home visits. Significantly, however, Mother still did not believe that the older daughter was abused, and she remained married to Father. Although Daniel did not see Father or his belongings at Mother's home in her unannounced visits, she saw Mother and Father together in town at a gas station, and Daniel was under the impression that Mother was still seeing Father.

With respect to Father, Daniel stated that Father came to all scheduled visits with the two younger children and participated with the counselor. Based on his attorney's recommendation, Father did not undergo either a mental health assessment or parenting assessment, as required under the permanency plans. Daniel confirmed that Mother and Father had both stipulated to the dependency and neglect finding based on Father's sexual abuse and Mother's flight from the jurisdiction with Father and the children. She testified that the Juvenile Court later made a finding of severe child abuse against both parents as to all three children. Daniel explained that, once the children were placed in North Carolina, the case was transferred to another DCS worker.

The Court then heard testimony from the DCS worker who took over from Daniel in July 2011, Jessica Shilliday. Shilliday explained that when the children were in North Carolina

with Mother's relative, they developed behavioral problems that prompted an emergency removal to Tennessee, where the children were placed back into foster care.

Shilliday confirmed that, once the Juvenile Court made a finding of severe child abuse as to both parents, it relieved DCS of the obligation to make reasonable efforts to reunite the parent with the children, in October 2011. Since that time, Shilliday said, Mother had maintained supervised visitation with the children. She said that, overall, the visits were good. Asked about the parents' financial support during the four-month period prior to the filing of the termination petition, Shilliday said that Mother sometimes brought gifts to the children during her visits, but Mother did not provide any monetary support to the children's foster parents. She was unaware of any support provided by Father during the four-month period preceding his incarceration.

Shilliday said that neither parent had established a suitable home for their children. Father was incarcerated during the entire time Shilliday had been assigned to the family. Mother had moved at least six times since the children were taken into DCS custody. Of great concern was the fact that Mother still did not believe the older daughter's claim that Father sexually abused her, and that Mother apparently blamed the child for the family's situation. Moreover, Shilliday stated, Mother has never taken responsibility for her failure to protect the children in this case.

Shilliday also testified about the children's foster care. At the time of trial, the younger daughter was living with her foster family in Jackson, Tennessee, and the son and the older daughter were placed with another foster family. She said that the children have the opportunity to visit with one another and that all of the children are well-bonded with their foster families. The children's foster parents hope to adopt them, and the children want this as well. Indeed, Shilliday commented, the older daughter had ordered a school ring with her new adoptive name on it. Shilliday believed that a change in caretakers at this point would have a substantial negative impact on the children and felt that termination of the parents' rights was in the children's best interest.

The children's foster parents testified as well. All described how well the children were doing in school and otherwise, and said that they got along with other children, including other foster children, in the foster homes. They confirmed that they had not received financial support from Mother or Father. The older daughter's foster mother testified that the child did not discuss the details of her abuse, but she did tell the foster mother that Mother had told the child in a telephone call that it was all her fault that she was in foster care and that she needed to recant her allegations of abuse. The older daughter's foster mother said that this upset the child. The potential impact of removing the children from their foster homes was described as "traumatic." The foster parents testified that they

believed that termination of the parental rights of Mother and Father was in the children's best interest. All of the foster parents said they were able to care for the children financially and emotionally, and hoped to adopt them.

At the conclusion of the evidence, the Juvenile Court took a short break and then issued a lengthy oral ruling, finding grounds for termination as to both parents and finding that termination was in the children's best interest. This was followed by a detailed written order setting forth its findings of fact and conclusions of law, entered on May 30, 2012. As to both parents, the Juvenile Court found by clear and convincing evidence that each had abandoned their children by failure to establish a suitable home, persistence of conditions, and severe child abuse. With respect to Father only, the Juvenile Court also found that Father abandoned his children by failing to support during the four-month period that preceded his incarceration, and that he abandoned them by engaging in conduct prior to his incarceration that exhibited a wanton disregard for their welfare. The Juvenile Court declined to find abandonment by failure to support as to Mother and declined to find abandonment by failure to visit as to Father, for the time period prior to his incarceration. The Juvenile Court found by clear and convincing evidence that termination of the parental rights of both Mother and Father was in the best interest of the children. Mother and Father now appeal.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, both Mother and Father argue that the trial court erred in finding by clear and convincing evidence the grounds for termination of their parental rights and in finding by clear and convincing evidence that termination is in the children's best interest.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1)(2012). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K. B.*, No. W2010-02496-COA-R3-PT, 2011 Tenn. App. LEXIS 549, at *20; 2011 WL 4634241, at *7 (Tenn. Ct. App. Oct. 7, 2011).

The heightened burden of proof in cases involving the termination of parental rights serves to minimize the risk of an erroneous decision. *In re M.J.B.,* 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Evidence satisfying the clear and convincing evidence standard must establish

that the truth of the facts asserted are "highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 Tenn. App. LEXIS 10, at *13-14; 2008 WL 115538, at *4 (Tenn. Ct. App. Jan. 10, 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, at *26; 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003)). Clear and convincing evidence must produce a firm belief or conviction in the fact finder's mind regarding the truth of the facts sought to be established. *In re A.T.P.*, 2008 Tenn. App. LEXIS 10, at *14, 2008 WL 115538, at *4 (citing *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted, is 'highly probable' as opposed to merely 'more probable than not.'" *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

Because of the clear and convincing evidence burden of proof in parental termination cases, appellate courts must adapt the customary standard of review as set forth in Rule 13(d) of the Tennessee Rules of Appellate Procedure. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re Audrey S*., 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, each of the trial court's specific factual findings must be reviewed *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Tiffany B.*, 228 S.W.3d at 156; Tenn. R. App. P. 13(d)(2011). When the trial court's factual finding is based on the assessment of a witness's credibility, this Court will afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Second, the appellate court must decide whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *In re Audrey S.,* 182 S.W.3d at 861; *In re Askia K. B.,* 2011 Tenn. App. LEXIS 549, at *20; 2011 WL 4634241, at *7. The trial court's conclusions of law, including its conclusion that the State presented clear and convincing evidence to support termination, are reviewed *de novo* with no presumption of correctness. *See In re the Adoption of A.M.H.*, 215 S.W.3d at 809; *In re Tiffany B.*, 228 S.W.3d at 156.

## ANALYSIS

A biological parent's right to the care and the custody of her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65; 120 S. Ct. 2054, 2060 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d at 809; *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right

is fundamental and superior to the claims of other persons, it is not absolute. *In re Giorgianna H.*, 205 S.W.3d at 515 (citing *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d at 653. "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re M.J.B.*, 140 S.W.3d at 653 (citing *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996)).

As noted above, Tennessee statutes require the party seeking the termination of the parental rights of a biological parent to prove by clear and convincing evidence both the grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113. We consider first the grounds for termination found by the trial court and then the best interest of the children.

## Grounds for Termination

In this case, the trial court found that several grounds for termination had been established by clear and convincing evidence. As noted above, only one ground need be established for the termination of parental rights. Tenn. Code Ann. §36-1-113(g). We consider first the ground of severe child abuse, and then address the remaining grounds.

### *Severe Child Abuse*

The Juvenile Court found that the ground of severe child abuse had been established as to both Mother and Father. For the purposes of termination, Tennessee Code Annotated § 36-1-113(g)(4),[4] which establishes severe child abuse as a ground for termination, refers to the term "severe child abuse" as defined in Tennessee Code Annotated § 37-1-102(b)(23). The definition at issue in this appeal is contained in subsection (C), which defines it as follows:

---

[4]Section 36-1-113(g)(4) states as follows:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4).

The commission of any act towards the child prohibited by §§ 39-13-502, 39-13-504, 39-13-522, 39-15-302, 39-15-402, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child[.]

Tenn. Code Ann. § 37-1-102(b)(23)(C)(2012).  In the dependency and neglect proceedings for these children, the Juvenile Court found that Father had committed severe child abuse by sexually abusing his older daughter, in violation of two of the statutes listed above, Sections 39-13-504 and 39-13-522.  It found that Mother had committed severe child abuse by, *inter alia,* failing to protect her children from Father's sexual abuse.  Neither Mother nor Father appealed these findings.

This Court has discussed the ramifications of a finding of severe child abuse against a biological parent in dependency and neglect proceedings, and its impact on a later action to terminate parental rights:  "The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights."  ***Tenn. Dep't of Children's Servs. v. M.S.***, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10; 2005 Tenn. App. LEXIS 139, at *31 (Tenn. Ct. App. Mar. 8, 2005).  The statute setting forth this ground for termination states:

The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, *under any prior order of a court* or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added).  Thus, under this provision in the termination statutes, once the finding of severe child abuse in the dependency and neglect proceedings becomes final, "[t]he ground itself is proved by [the] prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing."  ***M.S.,*** 2005 WL 549141 at *10; 2005 Tenn. App. LEXIS 139, at *31.

On appeal, Mother argues that the evidence at the trial on the petition to terminate her parental rights did not clearly and convincingly show that she committed severe child abuse.  Father argues that he pled guilty to aggravated sexual battery of his older daughter only as "a best interest plea" and he does not admit such abuse.  These arguments are unavailing.  It is undisputed that neither Mother nor Father appealed the Juvenile Court's findings of severe child abuse in the underlying dependency and neglect proceedings, and they became

final. Under the termination statutes, once this occurs, "one ground for termination of the parent's parental rights is effectively established." ***In re Samaria S***., 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011).

Accordingly, we affirm the Juvenile Court's finding that the ground of severe child abuse was established by clear and convincing evidence as to both Mother and Father.

### *Remaining Grounds*

As noted above, the Juvenile Court found that numerous grounds for termination had been established by clear and convincing evidence. As to both parents, the Juvenile Court found by clear and convincing evidence that each had abandoned their children by failure to establish a suitable home, persistence of conditions, and severe child abuse. With respect to Father only, the Juvenile Court also found that Father abandoned his children by failing to support them during the four-month period that preceded his incarceration, and that he abandoned them by engaging in conduct prior to his incarceration that exhibited a wanton disregard for their welfare.

Although only one ground is necessary to sustain a trial court's decision to terminate the parental rights of a biological parent, in light of the grave consequences of a decision to terminate parental rights, we have carefully examined the appellate record as to each of the grounds enumerated above. From our review, we find that the evidence does not clearly and convincingly establish the ground of abandonment by failure to support by Father. At the time the termination petition was filed, Father was incarcerated for the sexual abuse of the parties' older daughter. Consequently, the applicable definition of abandonment by failure to support is contained in Tennessee Code Annotated § 36-1-102(1)(A)(iv):

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(2012). Under the statute, the parent's failure to support must be "willful." ***See In re M.L.D.***, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005). The parent's failure to support is deemed willful only if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." ***In re M.F.O,*** No.

M2008-01322-COA-R3-PT, 2009 WL 1456319, at *3; 2009 Tenn. App. LEXIS 338, at *9 (Tenn. Ct. App. May 21, 2009) (citing *Tenn. Dep't. of Children's Servs. v. Calabretta*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004)).

We note that, in this case, there was no court order requiring Father to pay support, and the permanency plans did not require it. There is no evidence in the record that Father was told to whom any support should be paid. This does not, of course, relieve Father of the legal obligation to provide financial support for his children. *See In re M.F.O,* 2009 WL 1456319, at *3; 2009 Tenn. App. LEXIS 338, at *9-10 (citing *Calabretta*, 148 S.W.3d at 926). It does, however, factor into our evaluation of the evidence on whether Father's failure to pay support was willful. It is undisputed that Father did not pay child support to either DCS or to the children's foster parents. However, Father testified that, prior to his incarceration, he provided Mother with money to keep up the household and to purchase needed items for their children. Mother testified that she used the monies Father provided to bring the children toys, clothing, school supplies, and other items when she saw them for scheduled visitation. Both DCS case workers testified that Mother regularly brought such items to her visits with the children. Under these circumstances, we must find that the evidence does not clearly and convincingly establish that Father's failure to pay support during the four-month period prior to his incarceration was willful. Therefore, the Juvenile Court's finding on this ground must be reversed.

We have also carefully reviewed the evidence in the appellate record on the remaining grounds for termination for both Mother and Father, enumerated above. After a detailed review, we conclude that all of the remaining grounds are supported by clear and convincing evidence. Therefore, the Juvenile Court's findings on the remaining grounds for termination of the parental rights of Mother and Father are affirmed.

### Best Interest

In order to terminate the parental rights of a biological parent, the party seeking termination must also prove by clear and convincing evidence that termination is in the best interest of the children. *See In re Heaven L.F.*, 311 S.W.3d 435, 440 (Tenn. Ct. App. 2010). Tennessee statutes governing actions for termination set forth factors to be considered in making the determination on whether termination is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(i) (2009).[5] Neither the trial court nor this Court is required to

---

[5]Under Tennessee Code Annotated § 36-1-113(i), the factors examined in order to determine whether termination is in the children's best interests are:

(continued...)

find each factor applicable in order to conclude that termination of the parental rights of the biological parent is in the children's best interest. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

On appeal, Mother emphasizes that she visited the children regularly and complied with requirements in the permanency plan such as attending parenting classes and obtaining a

---

[5](...continued)

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9) (2009). The list of factors found in Section 36-1-113(i) is not exhaustive. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

mental health assessment. Father testified that he visited the children when permitted to do so and made efforts to provide financial support prior to his incarceration.[6]

From our review of the record, the evidence supports the Juvenile Court's finding that neither parent has made a lasting adjustment of circumstance, conduct, or condition so as to make it safe for these children to return to their home. Tenn. Code Ann. § 36-1-113(i)(1) and (2). Mother is financially unstable, has no meaningful employment, and has not obtained stable housing that is suitable for the parties' children. At the time of trial, Father was incarcerated and obviously in no position to take custody of his children. Most importantly, neither parent has accepted responsibility for the severe abuse inflicted on their children. Despite having pled guilty to aggravated sexual battery, Father continues to steadfastly deny any sexual abuse of his daughter. Mother fled the jurisdiction with the children and the man who sexually abused her daughter, and at the time of trial remained married to him. The proof shows that, for a long time, she denied that the abuse occurred; by the time of trial, she would say at best that she does not know if it occurred. Under these circumstances, if the children were returned to their parents' custody, Father's proclivity to inflict severe abuse on his children remains unchecked, and Mother remains utterly unwilling to protect her children from his abuse.

The evidence also shows that a change in caretaker or environment would be likely to have a substantial negative effect on the children's emotional and psychological well-being. Tenn. Code Ann. § 36-1-113(i)(5). The undisputed evidence showed that the children are flourishing with their foster families and are well-bonded with them. The Juvenile Court heard testimony from one child's foster parent that removing the child from the foster home would have a "traumatic" effect on the child.[7] Moreover, both foster families hope to adopt the children. The evidence shows that removing the children from their foster homes and returning them to the custody of their biological parents would surely have a substantial negative impact on them.

---

[6]Father raises the issue of best interest in the Statement of the Issues in his appellate brief, but does not argue the issue in the body of his brief. Normally, this would result in a finding by this Court that Father had waived the issue on appeal. Tenn. R. App. P. 27(a)(7); *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000). However, given the gravity of an action to terminate parental rights, we exercise our discretion to consider the issue. Tenn. R. App. P. 2.

[7]In the Juvenile Court's order, it stated that it had "not heard any proof to determine whether a change of caretaker and physical environment is likely to have an effect on the children's emotional, physical and medical condition." This is a puzzling statement, since there was ample, undisputed evidence in the record to support a finding that removing the children from their foster families would affect them adversely.

Looking at the record as a whole, the evidence clearly and convincingly supports the trial court's conclusion that termination of the parental rights of both parents is in the best interest of these children. *See White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Accordingly, we affirm the trial court's termination of the parental rights of both Mother and Father.

## CONCLUSION

The decision of the trial court is reversed in part and affirmed in part. Costs on appeal shall be assessed one-half against Appellant J.L.H. and one-half against Appellant B.J.H., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE