# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 22, 2012

## IN RE JACOB A.G. ET AL.

**Appeal from the Juvenile Court for Cumberland County**
**No. 2012-JV-2467     Larry M. Warner, Judge**

_____

### No. E2012-01213-COA-R3-PT-FILED-JANUARY 30, 2013

_____

Robin M.G. ("Mother") appeals the termination of her parental rights to her minor children, Daniel E.S. and Jacob A.G. ("the Children").[1] At separate times, the Children were removed to the custody of the Department of Children's Services ("DCS") and were placed in foster care. DCS took custody of Daniel after he pleaded "true" to disorderly conduct and was adjudicated unruly. A year later, DCS petitioned the court to declare both Children dependent and neglected in Mother's care and took Jacob into immediate protective custody. After the Children were adjudicated as being dependent and neglected, DCS implemented a permanency plan for each and worked with Mother for two years in a failed effort to reunify the family. DCS filed a petition to terminate Mother's parental rights. After a bench trial, the court found, by clear and convincing evidence, that multiple grounds for terminating Mother's rights exist and that termination is in the best interest of the Children. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Tiffany S. Lyon, Crossville, Tennessee, for the appellant, Robin M.G.

_____

[1]In the same proceeding, the trial court terminated the rights of Richard L.S., the father of Daniel E.S.; and Eric F., the putative father of Jacob A.G. Neither of these fathers appeared at trial and neither appealed their respective termination orders. We refer to them only as is necessary to recite the facts relevant to the termination of Robin M.G.'s parental rights.

Robert E. Cooper, Jr., Attorney General and Reporter, and Derek C. Jumper, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

On January 6, 2012, DCS filed a petition to terminate Mother's parental rights. The Children, Daniel E.S., and Jacob A.G., were born out of wedlock to Mother on June 28, 1997, and September 26, 2002, respectively. At trial, Daniel was nearly fifteen and Jacob was almost ten. Since being removed from Mother's custody, the Children have remained continuously in foster care for approximately two years as of the time of trial.

The family's interaction with DCS began in February 2009 when DCS received a referral that alleged Daniel had been physically abused by Mother's live-in boyfriend, Danny J.R. A non-custodial plan was created for Daniel and the Children continued to lived with Mother and Danny J. R. In October 2009, Daniel was judicially declared unruly as a result of his disorderly behavior at home and school, conduct that Mother apparently could not control. Daniel was placed in DCS custody and a permanency plan was developed and entered with the goal of reuniting him with Mother within thirty days; in the meantime, Jacob remained with Mother. The plan required Mother to find and maintain stable housing and participate in family counseling and other measures to address Daniel's behavior and mental health needs.

On December 14, 2009, Mother and her boyfriend were hospitalized for a drug overdose. Testing showed Mother had used methamphetamine, amphetamine and opiates. The incident prompted DCS to investigate Jacob's welfare. Mother agreed to cooperate with DCS and a non-custodial permanency plan was implemented for Jacob. Mother participated in family and team meetings focusing on her goals and responsibilities in Daniel's plan. Mother's drug use, her need for stable housing and income, and Jacob's absences from school were a primary focus of the plans. Mother agreed to obtain stable housing and income, submit to weekly drug screens, complete an alcohol and drug assessment and follow related recommendations. She also agreed to attend family counseling to address these target areas.

Mother first underwent an alcohol and drug assessment in May 2010. Her counselor, Thomas Netherton, did not recommend treatment at that time but stated that inpatient treatment would be recommended if Mother failed to take her prescription pain medications as prescribed. At trial, Netherton noted that his recommendation would have changed if

Mother had informed him that she had had an overdose and had been, in general terms, more forthcoming. In August 2010, Mother (and Danny J.R.) had maintained a house for two months, but Mother remained unemployed. In September 2010, DCS held a team meeting with Mother to address her lack of compliance with the permanency plans. In particular, Mother had repeatedly refused or failed to submit to drugs screens despite frequent attempts by her case manger to visit her for this purpose. In addition, DCS was concerned that Jacob had missed more than a week of school – all unexcused absences – since school began three weeks earlier. Because Mother had not secured a suitable home, participated in family counseling or regularly visited Daniel, the goal of reuniting him with Mother had not been met. In October 2010, DCS took Jacob into protective custody and petitioned the trial court to declare both Children dependent and neglected, mostly due to Mother's continued drug problems. Mother had consistently failed to submit to drug screens as required and she had avoided DCS's frequent, repeated attempts at home visits. In January 2011, both Children were adjudicated dependent and neglected – a condition to which all parties stipulated. At the dispositional hearing, the trial court found that the Children should remain in foster care.

Mother underwent a second alcohol and drug assessment in April 2011, with the recommendation that she obtain intensive treatment and secure a letter from a doctor stating the medical necessity of her medications. DCS made attempts to locate an inpatient facility and requested funding for Mother's treatment. Mother herself located and made arrangements to attend inpatient drug treatment at "New Leaf" treatment facility. DCS provided the $100 application fee and provided transportation. Mother failed to complete her treatment and left the program against medical advice. She was then advised to participate in an outpatient program such as Narcotics Anonymous.

Mother's permanency plans were revised with the goal of allowing the Children to be returned to Mother, but little progress was made toward reunification. The first permanency plan for Daniel was developed in November 2009, shortly after he entered DCS custody. The goal of the plan was to "return to parent" within thirty days. Mother participated in its creation and agreed to its terms. In 2010, in the month of April, and again in August, the plan was revised, still with the goal of reunification. In August 2010, a non-custodial plan was developed for Jacob, who remained with Mother after Daniel's removal. When Jacob was also removed from Mother's custody, an initial permanency plan for him was entered in November 2010. A family permanency plan for both Children was entered in May 2011, after they were adjudicated dependent and neglected. Based on the lack of progress toward reunification of the family to that point, a dual goal of return to parent or adoption was included. The family's case workers at DCS and at Youth Villages, a social services agency, generally testified to the services they provided to the family and their efforts to assist Mother with her obligations under the permanency plans. They uniformly noted consistent problems in maintaining contact with Mother because she did not provide reliable contact

information to DCS – her cell phone frequently was inactive and she often moved without informing anyone or providing her current address or whereabouts.

In the first four months after both Children were removed as being dependent and neglected, DCS discussed with Mother the subject of applying for public housing. In addition, transportation was made available, drug screens were administered, and DCS assisted Mother in preparing a budget that provided for housing and utilities. Further, DCS searched for inpatient drug treatment programs. During the relevant period, Mother failed and/or refused numerous drug screens, failed to obtain stable housing or employment and failed to follow through with recommendations resulting from her alcohol and drug assessments. As to the Children, Mother demonstrated a bond with them and her case managers did not dispute that she loved the Children. At the same time, she missed scheduled visits with the Children and gave them hope that they would soon be reunited despite doing little to achieve the goals of the various plans. Some visits went well, while the Children were left disappointed and angry at other times.

In foster care, Daniel was initially placed in a group home to address his behavioral and mental health issues. Daniel made progress and in January 2011, the Children were placed together but their first foster home proved unsuitable – their caregiver used drugs and the Children had significant behavioral issues. Both Children attempted to run away and both were suspended from school. Subsequently, Jacob was placed with new foster parents, where he remained at the time of trial, and Daniel was transferred to a group residential facility. After being separated, both Children made progress.

Jacob's foster father testified he and Jacob had become "real good friends" in the year he had stayed with him and his wife. Jacob had many friends at their church and they shared many activities, such as football, that Jacob had never tried before. The foster parents were leaning toward trying to adopt Jacob, but first wanted to see how the termination case turned out.

According to Mother, she suffered from a neck injury and had back problems including a bulging disc and pinched nerves. For the past four years, she had taken prescription pain medications. Mother felt she had complied with the permanency plans to the best of her ability, but conceded there were "some things [she] [hadn't] done. . . ." She felt DCS had lied to her and given her no hope of succeeding in her efforts to regain custody. She explained she did not pursue the job lead DCS provided because she had no transportation and it was some six miles from her home. She attributed her many missed appointments and scheduled visits and absences from her home to her father's illness. Mother said she provided the Children with presents – video games – while they were in their first foster placement together, but they were stolen. She stated she once bought Daniel

shoes and clothes, and had given Jacob money after his birthday. Mother never completed a mental health assessment. Months after the termination case was pending, Mother requested funding from DCS but they instead referred her to a facility with which she had had issues in the past. At trial, Mother testified she was on a waiting list to reenter the drug treatment program at New Leaf. She remained unemployed, but testified that she had applied for jobs at many fast food eateries in the past two weeks. She noted that in the past she had volunteered and sometimes was paid to work at an outreach facility and had applied for disability assistance. Mother said at one point, she "got out of rehab, . . . got a house" and was "trying really hard"when her case manager informed her that DCS had decided to pursue termination of her parental rights. Mother said she loved the Children, wanted them back, and essentially never had a chance with DCS because she did not live her life to their standards.

At the conclusion of the trial, the court terminated Mother's parental rights. The trial court found there was clear and convincing evidence to show that Mother (1) abandoned the Children by failing to support them and by failing to establish a suitable home for them; (2) failed to resolve the conditions that made it necessary to remove the Children from her custody; and (3) failed to comply substantially with the requirements of the permanency plans. *See* Tenn. Code Ann. § 36- 1-113(g)(1), (2), (3)(Supp. 2012). The trial court further found that the evidence clearly and convincingly showed that it was in the Children's best interest that Mother's parental rights be forever terminated. The trial court awarded full custody of the Children to DCS with the right to place them for adoption. Mother filed a timely notice of appeal.

II.

Mother presents the following issues for our review, as taken verbatim from her brief:

> 1. Whether the trial court properly determined that [Mother] abandoned her [C]hildren by willfully failing to support them and by failing to establish for them a suitable home.
>
> 2. Whether the trial court properly determined that [Mother] was in substantial non-compliance with the permanency plans.
>
> 3. Whether the trial court properly determined that conditions still persist preventing the return of the [C]hildren to [Mother].
>
> 4. Whether the trial court properly determined that terminating [Mother's] parental rights was in the [C]hildren's best interest.

III.

A.

Mother challenges the trial court's findings that she abandoned the Children by failing to support them and by failing to establish a suitable home for them despite reasonable efforts by DCS to assist her. *See* Tenn. Code Ann. § 36-1-113(g)(1). As relevant to our analysis, "abandonment" is defined, in part, as follows:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to . . . support or have willfully failed to make reasonable payments toward the support of the child;

> (ii) [F]or a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(i), (ii)(2010). For purposes of establishing abandonment pursuant to Section 36-1-113(g)(1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child . . . ." Tenn. Code Ann. § 36-1-102(1)(A)(i)(D). We address the findings of abandonment in turn.

B.

In the present case, the relevant four-month period for establishing abandonment by failure to support is September 6, 2011, through January 6, 2012, the date the petition to terminate was filed. The trial court found as follows:

[Mother] has not contributed to the support of the [C]hildren since they were placed in foster care. [Mother] is able bodied and capable of working and supporting the [C]hildren. [Mother] was aware of her duty to support the [C]hildren. [Mother] has made no attempt to support the [C]hildren and has provided no justifiable excuse for failing to support the [C]hildren.

\* \* \*

[Mother] was advised on 11-18-09, 9-17-10, 11-12-10 and 5-4-11 that willful failure to . . . contribute to the support of the [C]hildren for four consecutive months was grounds for termination . . . . [Mother] signed the acknowledged of receipt of the Criteria and Procedure for Termination of Parental Rights on [four specified dates]. The Court reviewed the Criteria and Procedure for Termination . . . with [Mother]. . . .

Mother contends that the trial court erred in finding that she willfully failed to support the Children. She asserts that her failure to provide monetary support was not willful – she states that she had neck and back injuries and was seeking disability benefits during the critical four-month period. She states that, despite all of this, she had applied for various jobs and provided clothing, food and, on one occasion, cash to Jacob, while seeking disability benefits. Mother concludes that the evidence clearly shows that she supported the Children. We disagree.

From the time of the first permanency plans, which she helped developed and agreed to, Mother was aware of the requirement that she obtain a legal income sufficient to support herself and the Children – whether by employment or government assistance. "Failure to pay support under the termination statutes is 'willful' if the parent 'is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.' " *State of Tenn., Dep't. of Children's Serv. v. Calabretta*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) (citing *In re Adoption of Muir*, 2003 WL 22794524 (Tenn. Ct. App. Nov. 25, 2003)). Just after Jacob came into state custody, Mother reported she had been employed at a Dollar Store, but was unable to provide verification. A year went by before Mother told her case worker she had found a job at a community outreach center. As it turned out, Mother volunteered and occasionally was paid to work at the center, but she never had a real job there. Mother never produced a pay statement or other verification of employment as requested. Citing a lack of transportation, Mother admitted that she never applied for a job at a sewing factory that her case worker, who had personal contacts with the employer, offered to help her pursue. Other

than Mother's uncorroborated testimony, there was no evidence at trial that Mother ever sought or held employment at any time since the Children were removed from her custody despite her testimony that she submitted applications at "all the different places around town." The only "proof of income" she provided DCS was a disability benefits check made out to her boyfriend. Lastly, contrary to Mother's testimony, Jacob's foster parents testified that Mother never provided him anything – no food during visits, no clothes, no school supplies, no toys, and no money, but had often made him empty promises to do so.

In summary, the proof showed that Mother was aware of her support obligation, was able to work, and had no justifiable excuse for not actively pursuing steady work or any other source of legal income. Instead, it appears that Mother was content to remain under the apparent effects of her continued drug use and to rely on the limited disability benefits of her boyfriend to support the "household," as it were. The evidence does not preponderate against the trial court's finding of Mother's willful failure to support the Children.

## C.

The trial court found that Mother also abandoned the Children by failing to establish a suitable home for them despite the efforts of DCS to assist her in this regard. Mother asserts that, contrary to the trial court's findings, there was evidence to show that she had established a suitable home for the Children and was available to supply them with the care and attention they required.

As we noted earlier, the Children were removed from Mother and placed in DCS custody, in foster care, in 2009 and 2010. In 2011, a judicial finding of dependency and neglect was entered as to both Children. For purposes of establishing abandonment by failure to establish a suitable home, we focus, as did the parties at trial, on the four-month period from October 22, 2010 – when Jacob was removed and both Children were in state custody as a result of the finding of dependency and neglect – to February 22, 2011.

The trial court stated:

> For a period of four (4) months following [their] removal . . . , [DCS] has made reasonable efforts to assist [Mother] to establish a suitable home for the [C]hildren, but the parent has made no reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the [C]hildren to such a degree that it appears unlikely that [Mother] will be able to provide a suitable home for the [C]hildren at an early date.

The reasonable efforts [DCS] made in the first four months include making the [C]hildren available for visitation, administering urine drug screens, assisting the parent in completing a budget, assisting in locating inpatient A & D treatment and offering transportation.

[Mother's] lack of reasonable efforts include[s] failing drug screens, refusing to submit or not showing up for some drug screens, not completing A & D treatment, not establishing appropriate housing and visiting sporadically.

Again, the proof showed that Mother was formally and repeatedly advised that the failure to establish a suitable home for the Children was a ground for terminating her parental rights. There is little doubt that the biggest obstacle preventing Mother from achieving her obligations that would have allowed the Children to return to her was her refusal or inability to address her drug abuse. According to her case worker, Mother was not happy about it, but understood that in order for the Children to come home, both Mother and Danny J.R. would have to comply with drug treatment and pill counts to establish a suitable – that is, drug-free – home. Certainly, consistently passing drug screens would have gone far in helping Mother to establish that she could provide a safe, suitable home environment. At one point, Mother discussed with her case manager her desire to leave Danny J.R.and establish her own home. He located emergency housing for Mother, but she apparently changed her mind and continued to reside with Danny J.R., despite acknowledging he also abused drugs.

In the critical four months after the Children's removal, Mother refused or cancelled at least 10 drug screens. Moreover, Mother did not obtain an otherwise suitable structure to live in until September 2011, more than a year after the Children's removal. Even at that, she lost that home within one to two months later. In this regard, we think the following observation by this Court is appropriate here:

While there is, of course, a physical element to the concept of a "suitable home," the problems and conditions for which the various assessment and counseling efforts were conducted address matters which make the home environment suitable for raising children and which keep them from becoming dependent and neglected. A well-built, fully furnished home does not a "suitable home" make; neither is a home which may lack some comforts or conveniences unsuitable for that reason alone. The failure of Mother and Father to cooperate with DCS and to comply with the requirements of the various counseling services

was directly related to the establishment and maintenance of a suitable home.

*In Re M.F.O. and J.O.O., II*, No. M2008-01322-COA-R3-PT, 2009 WL1456319 at *5 (Tenn. Ct. App. M.S., filed May 21, 2009). In the present case, Mother moved from place to place, and seemingly spent much of her time trying to avoid DCS and the agency's efforts to help rather than tackling her drug use and the other issues which prevented her from making any real progress at creating a stable, safe home for the Children.

The evidence does not preponderate against the trial court's finding of abandonment by failure to establish a suitable home.

IV.

As an additional ground for termination, the trial court found that Mother failed to comply substantially with the terms of the various permanency plans. Tenn. Code Ann. § 36-1-113(g)(2) provides, in relevant part, that termination may be pursued when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan. . . ." Mother asserts that she was in substantial compliance with the permanency plan requirements. In particular, she asserts that she "completed two Alcohol and Drug Assessments," and "has a home, transportation and employment." Mother essentially concludes that she has "worked quite diligently to achieve the return of her children" and the trial court erred in finding otherwise.

The Children's permanency plans required Mother to complete essentially the same requirements in order to regain custody of the Children. The initial plan for Daniel required Mother to attend parenting classes for a special needs child and find appropriate housing. Subsequent plans added other requirements for Mother to complete:

> Establish legal income to support herself (from gainful
>    employment or government assistance);
> Provide DCS with proof of income and complete a budget to
>    show she can meet the family's needs;
> Maintain clean home with working utilities;
> Check status of waiting list for public housing;
> Ensure no drug use by anyone in Mother's home;
> Allow regular visits by DCS to ensure home remains appropriate;
> Abstain from using illegal drugs or misusing prescription drugs;
> Submit to random drug screens;
> Following alcohol & drug assessment recommendations;

-10-

Demonstrated learned parenting skills;
Demonstrate ability not to allow herself to be mentally or physically abused;
Obtain mental health assessment and follow recommendations;
Make prescription drug available for pill counts and only take prescriptions as prescribed;
Use existing transportation or make arrangements with DCS or youth services provided if transportation needed;
Utilize in-home services through Youth Villages

The trial court made the following findings regarding Mother's failure to satisfy the terms of the permanency plans:

> [Mother] has not completed the following requirements in the permanency plans: she left in-patient A & D treatment against medical advice, she has not completed recommended A & D treatment that was suppose[d] to follow the completion of her in-patient treatment, she has refuse[d] or failed appointments for urine and hair follicle drug screens, she has not obtained a mental health assessment, she has no means of income and she has not made her prescribed medications available for a pill count prior to drug screens.

> [DCS] made reasonable efforts to assist [Mother] in complying with the requirements in the permanency plan by making the [C]hildren available for visitation, developing permanency plans with [Mother], providing urine and hair follicle drug[] screens, providing a gas card, providing contact information to schedule A & D assessments with multiple agencies, scheduling A & D assessment appointments, offering assistance with transportation to A & D appointments and the [C]hildren's medical and educational appointments, contacting homeless shelter to assist her with emergency housing, transporting her to in-patient treatment program, discussing budgeting with her, providing intensive family reunification services through Youth Villages, making home visits, encouraging her to complete her mental health assessment.

After both Children were removed, the proof was to the effect that Mother did not work or seek employment, but relied for support on disability benefits that Danny J.R.

received. Regarding housing, the proof indicated that Mother moved at least six times between November 2009, after Daniel was removed, and January 2011, when the Children were declared dependent and neglected. Mother "bounced around" from place to place and lived with friends, in motel rooms, in a home for a short time, and with her father. The family's last DCS case worker, Benjamin Breeding, handled the Children's cases since February 2011. He testified that it became increasingly difficult to locate Mother as she moved without notifying DCS or updating her address. At trial, he stated that he "typically had no idea where [Mother] was staying" and was not aware of her residence at the time of trial. Mr. Breeding further noted that Mother attributed some of her failures, particular in resolving her prescription drug abuse, to Danny J.R., whom she admitted was a drug user, and openly discussed wanting to leave him and doing better at working toward restoring her custody of the Children. By all indications, Mother continued to live with Danny J.R.

In a 21-page affidavit, Mr. Breeding detailed all of the efforts he and prior case workers made to assist Mother to meet the goals of the permanency plans. Breeding documented 22 separate dates of unsuccessful attempts to contact Mother between February 2011 and April 2012. DCS made regular, frequent attempts to visit Mother at her home, but they were limited because, other than the home in Sparta, she moved and failed to provide DCS with her addresses. The case file noted 20 failed attempts by previous case workers to visit her in person, and Breeding had more than 30 failed attempts to visit Mother at her home or at the offices of DCS. Mother was upset with the prior case managers and expressed that she did not know what she was supposed to be doing under the permanency plans. As a result, Breeding met with Mother and personally again reviewed with her the requirements of the permanency plans and multiple revised plans and the criteria for termination of parental rights.

Around September 2011, Mother located a trailer to live in, but was unable to move in because of several outstanding utility bills. Instead, she moved into a suitable two-bedroom house she found in Sparta. At the same time, she tested positive for oxycodone that she attributed to a four-day supply she said she was prescribed. Two weeks later, she failed another drug screen and was unable to supply proof of her prescription drug usage/pill count. At trial, Mother conceded that she had never complied with the requirement that she provide her prescriptions medications to allow her case workers to perform a "pill count" to ensure that she was using the medications strictly as prescribed.

In October 2011, Mother returned to Thomas Netheron for another alcohol and drug assessment. Resulting recommendations included that Mother participate in a narcotics anonymous-type program to assist her in refraining from abusing her prescription drugs, complete a detoxification program, and receive intensive outpatient substance abuse treatment. After prematurely leaving the New Leaf facility, Mother never obtained further

drug treatment. At trial, Mother explained that she had left the program because "it was a twenty-eight day program and [she] couldn't speak to [the Children] . . . for the whole twenty-eight days." Mother agreed that she never made her medications available for pill counts by DCS. She said her case manager told her that she had to stop taking the medications if she wanted the Children returned to her, but explained that there were "only spurts throughout the whole process that [she] hadn't been on [her] medications, . . . never consistently to where [she] could do pill counts." On the other hand, she claimed there were "many, many" times she was not taking her medication in an effort to get the Children back. In all, throughout the case, Mother passed fourteen drugs screens by DCS and failed fifteen. Mother failed to show up for scheduled drug screens or refused to take them some 34 other times. Mother continued to live with Danny J.R., also a drug user. At times Mother had talked of leaving him but apparently changed her mind. Of the drug screens he agreed to take, Danny J.R. passed four and failed fourteen.

After Mother "fell off the radar" for the next two months, DCS added the dual goals of return to parent and adoption to the permanency plans. On November 3, 2011, Mother resurfaced and reported to DCS that she had found a job. The following month, DCS confirmed their suspicion that Mother had left the house in Sparta and had been living with her father. Her case managers tried multiple times, without success, to set up further hair follicle drug screens for her. When Mother was finally tested on December 15, 2011, the results showed a "high use" level of hydromorphone and oxycodone. By then, Youth Villages had decreased their scheduled visits from three to one a week because they were consistently unable to locate Mother to provide services to her. Any DCS contact with Mother also further declined. Breeding provided gas cards to Mother to help her get to her drug screens and visitation, but was unable to provide more of them because Mother failed to provide requested receipts.

In summary, the proof showed that Mother's misuse of prescription painkillers, the lack of suitable housing for her and the Children, and her inability to support the family were issues that Mother never sufficiently addressed. Although Mother made some progress in some areas, it was not long-lasting – her drug use continued, she had a suitable home for only a month or two, and she never secured stable income. We cannot agree with Mother's assertion that she was in "substantial" compliance with the permanency plans.

The evidence does not preponderate against the trial court's finding that Mother failed to comply substantially with the terms of the permanency plans. The trial court did not err in terminating Mother's rights on this ground.

V.

The trial court further terminated Mother's rights based on its finding that the conditions that resulted in the Children's removal from her custody remained at the time of trial. Tenn. Code Ann. § 36-1-113(g)(3) provides for termination of a parent's rights on the ground commonly referred to as "persistent conditions" under the following circumstances:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

In support of its finding of persistent conditions, the trial court stated:

> The conditions that led to the removal of the [C]hildren from the home of [Mother] were her continued drug abuse after an overdose, not having an appropriate, stable home and the [C]hildren's truancy from school.
>
> The conditions that prevent the [C]hildren's return to the parent's home are failure to address her A & D issues, her failure to consistently comply with urine drug screens, her failure to supply DCS with copies of her prescription for verification and pill counts, her failure to complete mental health treatment, her failure to attend the [C]hildren's mental health and medical appointments and not maintaining contact with DCS. She has no source of legal income to support herself.

Again, the trial court expressly found that DCS had exercised reasonable efforts to assist Mother in remedying the conditions that led to the Children being placed in long-term foster care. As we have noted, DCS and other social services units worked with Mother for roughly two years after the Children came into state custody before the decision was made to pursue termination. During that time, Mother was unable to resolve any of the conditions that led to the Children's removal and prevented their safe return. Nothing in the proof at trial leads to the conclusion that it is likely that Mother can resolve the persisting conditions at an early date. Conversely, there is every indication that permitting the parent-child relationship to continue, after the Children have lingered in foster care for years, would greatly diminish their chances of becoming a part of a safe, stable and permanent home.

VI.

With respect to the issue of the best interest of the child, this Court has observed:

> When at least one ground for termination of parental rights has been established, as here, DCS must then prove, by clear and convincing evidence, that termination of the parent' rights is in a child's best interest. When a parent has been found to be unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest.

*In re Eila L.G*, No. E2012-00922-COA-R3-PT, 2013 WL 20884 at * 3 (Tenn. Ct. App. E.S., filed Jan. 2, 2013)(internal citations omitted).

Having concluded that the trial court properly determined that grounds for termination exist in the present case, we turn to the trial court's best-interest analysis. Our review is guided by the non-exclusive list of factors set forth in Tenn. Code Ann. § 36-1-113(i)[2]:

---

[2]The statutory factors are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(continued...)

We summarize pertinent portions of the trial court's findings in support of its conclusion that termination of Mother's rights is in the Children's best interest:

– Mother had not made an adjustment of circumstances, conduct or conditions as to make it safe and in the Children's best interest to be in her home;

– Mother failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible;

–Mother's use of . . . controlled substances rendered her consistently unable to care for the Children in a safe and stable manner;

---

[2](...continued)
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

– Mother's emotional status would be detrimental to the Children and/or would prevent her from providing safe and stable care and supervision for the Children;

–Mother failed to pay child support consistently with the child support guidelines;

– Mother has not paid a reasonable portion of the Children's substitute physical care and maintenance when financially able to do so. She has not regularly provided food, clothing, toiletries or other supplies the Children need on a daily basis;

–Mother continues to make lifestyle choices that prevent her from being able to parent the Children or to provide a home for them.

In addition, the trial court found, as to Jacob, that a change of his caretaker and home was likely to have a negative effect on his emotional, psychological and/or medical conditions – he had developed a strong bond with his foster parents, who were interested in adopting him. The trial court found that both Children "need to be released from the stigma of being foster children."[3]

By May 2011, the permanency plans had added adoption as a goal for the Children. Their May 4, 2011 family permanency plan expressly noted that "Daniel and Jacob are having a difficult time with their long stay in foster care." The evidence indicated that Jacob was doing very well in his current foster home – his behavior and school performance had greatly improved. Foster Father said they had made Jacob available to Mother through visits and by telephone, but reaching her was difficult and she had made "broken promises" to visit and bring gifts that left Jacob "pretty upset." Mother had never supplied Jacob with any basic necessities or school supplies or toys. Jacob was in the third grade and had made the honor roll since coming to his foster home, whereas he previously was suspended multiple times and "barely" advanced. He had shown an interest, even excitement, about going to school, had friends, and had teachers who worked to help him. The foster parents allowed Jacob to have supervised visits with Daniel at their home. Jacob had grown very close to his foster parents who were leaning toward adoption if it became an option. On one occasion, the foster parents overhead Mother telling Jacob that she was thinking about kidnapping him and that Jacob became scared and "clingy" afterwards. Foster Father felt it was in Jacob's best interest "to

---

[3]The record is not entirely clear but appears to indicate that Daniel remained in a residential foster care facility at the time of trial.

go forward and not backward." For her part, Jacob's Foster Mother added, "I love that child." As to Daniel, there was evidence that his needs were being better addressed in a group setting, he was able to see his brother, and his behavior had improved to the point that less restrictions were recommended.

The evidence does not preponderate against the trial court's findings in support of its best interest determination. Clear and convincing evidence exists to show that the Children are best served by permanently severing Mother's parental rights and allowing the Children to get out of foster care "limbo" and go forward with a real chance for permanency in their lives.

VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Robin M.G. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE