IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 4, 2016

## IN RE: QUADAVON H., ET AL.[1]

**Appeal from the Juvenile Court for Knox County**
No. 69346     Timothy E. Irwin, Judge

_____

**No. E2015-02001-COA-R3-PT**
**FILED-JUNE 16, 2016**

_____

Mother appeals the termination of her parental rights to two children, asserting that the evidence does not sustain the grounds of abandonment by failure to support and persistence of conditions as found by the court and does not support the finding that termination of Mother's rights was in the children's best interest. Upon our review, the record clearly and convincingly supports the grounds found by the court, as well as the finding that termination of Mother's rights is in the children's best interest; consequently, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Heather G. Inman, Knoxville, Tennessee, for the appellant, Vanessa L. N.

Herbert H. Slatery, III, Attorney General and Reporter; and Rachel E. Buckley, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

Vanessa N. ("Mother") appeals the order of the Knox County Juvenile Court terminating her parental rights to her sons, Quadavon H. (born in 2007) and Eric N. (born in 2011). The petition seeking termination was filed on April 3, 2015 by the Department

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

of Children's Services ("DCS"), in whose custody both children had been placed as a result of dependent and neglected proceedings.

The petition alleged three grounds supporting termination: abandonment by failure to support, persistence of conditions, and failure to comply with the responsibilities in the permanency plans developed when the children were in DCS custody.[2] Counsel was appointed for Mother, and trial was held on September 24; on October 12 the court entered an order terminating Mother's parental rights on the grounds of abandonment by failure to support and persistence of conditions, and upon the finding that termination was in the children's best interest.[3] Mother appeals, stating the following issues:

> 1. Did the trial court err by finding clear and convincing evidence of persistent conditions as a statutory ground for termination pursuant to Tennessee Code Annotated, § 36-1-113(g)(3)?

> 2. Did the trial court err in finding clear and convincing evidence of abandonment for failure to pay child support pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i)?

> 3. Did the trial court err by finding clear and convincing evidence that it was in the best interest of the children to terminate their mother's parental rights?

## DISCUSSION

### I.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental

---

[2]  Termination of the parental rights of the children's father, Kevin H., is the subject of another proceeding.
[3]  The court declined to terminate Mother's rights on the ground of failure to comply with the permanency plan; no issue is presented in this appeal in that regard.

rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## II. ANALYSIS

### A. PERSISTENCE OF CONDITIONS

Parental rights may be terminated on the basis of "persistence of conditions" as defined by Tenn. Code Ann. § 36-1-113(g)(3) when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

3

To terminate parental rights on the ground of persistence of conditions, a finding by clear and convincing evidence of all three factors is required. *In re Valentine*, 79 S.W.3d at 549. Mother contends that the conditions which led to the children's removal did not persist, and that other conditions did not indicate that the children would be subjected to further abuse or neglect.

The trial court made extensive findings of fact regarding the circumstances which led to the removal of the two children at issue in this case, as well as Mother's other children.[4]
The court noted that Quadavon had come into DCS custody along with the other minor

[4] Mother had an extensive history with DCS with regard to her children. The record before us, while sketchy, shows the following proceedings relative to Mother's children:

> 1. Petition for Emergency Removal and Protective Custody Order with respect to Kevin H. and Emergency Petition for Transfer of Temporary Legal Custody and For Restraining Order with respect to Quadavon H., Joseph H., and Dion N., both filed in November 2009;
> 2. An Agreed Order entered April 24, 2010, reciting that the four children were initially placed in DCS custody as a result of the petitions, adjudicating the children to be dependent and neglected, and placing Dion, Quadavon and Joseph in a trial placement with their great aunt and continuing Kevin's placement at Columbus Home;
> 3. Permanency Plan Review Orders entered October 28, 2010, March 1, 2011, December 1, 2011;
> 4. Order entered April 24, 2012, *nunc pro tunc* to January 13, 2012, reciting that Dion began a trial home placement with Mother on November 30, 2011, and granting a trial home placement for Joseph with Mother;
> 5. Order entered April 24, 2012, granting a trial home placement for Kevin and Quadavon with Mother;
> 6. Petition for Temporary Legal Custody and Ex Parte Order filed June 11, 2012 by DCS asserting that Kevin, Dion, Joseph, Quadavon and Eric were dependent and neglected, along with Protective Custody Order entered that day bringing the children into DCS custody;
> 7. Agreed Order entered December 11, 2012 *nunc pro tunc* to September 17, 2012, adjudicating Kevin, Dion, Joseph, Quadavon, and Eric to be dependent and neglected;
> 8. Order entered February 23, 2013, *nunc pro tunc* to November 7, 2012, that, *inter alia*, continued the placement of Eric and Quadavon in a foster home and continued Joseph's, Kevin's, and Dion's placement in specific facilities;
> 9. Permanency Plan Review Orders entered May 22, 2013, November 4, 2014, and August 26, 2015;
> 10. Orders entered in Joseph's case following hearings on April 1 and July 27, 2015.

Reference is also made in the parties' briefs and in other parts of the record to earlier proceedings involving Mother's two oldest children, who had reached the age of majority prior to the proceedings involved in this case.

children in 2009 "due to their parents' incarceration and drug abuse resulting in inability to provide proper care and supervision for the children"; that Mother was incarcerated at the time of his removal on charges of simple possession and theft; that the children had been left with their grandmother who told DCS workers that "she was 'too stressed' to care for them"; that multiple permanency plans had been developed with essentially the same responsibilities, including that she establish and maintain sobriety, complete domestic violence counseling, obtain suitable housing, and pay support; that at an October 27, 2010 hearing, the court found that Mother was not in substantial compliance with the plan "in that she was not in substance abuse treatment and was continuing to fail drug screens" and did not have suitable housing; that at a review hearing in February 2011 she had "recently made progress" which allowed Dion to be returned for a trial home placement in November 2011 and Joseph in January 2012; that in April 2012 Mother was restored to custody of Dion and Joseph, and Quadavon and Kevin began a trial home placement; that on June 8, 2012, the children's father was arrested at Mother's home for getting into an altercation with Dion and choking him; and that Mother tested positive for drugs at the time of the incident. Mother does not dispute these facts, which are fully supported by the record in the dependent and neglect proceedings.

Mother argues that the concerns expressed at trial by the DCS caseworkers and the conditions upon which the court focused were not those which led to the children's removal from her home and, in addition, that the concerns and conditions would not cause the children to be subjected to further abuse or neglect. We respectfully disagree.

As an initial matter, this argument ignores the language in Tenn. Code Ann. § 36-1-113(g)(3)(A) that persistence of conditions is shown where "[t]he conditions that led to the child's removal *or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians*, still persist." (Emphasis added). The focus is not solely on the conditions which led to the removal of the children but includes the consideration of whether other conditions exist which would prevent the children's return. The evidence summarized below clearly meets that criteria.

Quadavon was initially removed from Mother's home in 2009 because of his parents' incarceration and drug use, and the ensuing years were characterized by Mother's failure to adhere to the permanency plans, homelessness, incarcerations, and relapses after periods of sobriety, up to the date of the termination hearing. There are three permanency plan review orders in the record relative to the plans adopted following the removal of Quadavon from Mother's custody in 2009, and three plans following the removal of Quadavon and Eric from the trial home placement with Mother in 2012.[5] The

_____

[5] Although Mother's failure to comply with the permanency plans adopted after the children's removal

orders include the following portions pertinent to our consideration of this issue:

- order entered October 28, 2010 notes that Mother "is not in substance abuse treatment as recommended and continues to fail drug screens" and that she "is without suitable housing and needs to establish sobriety."
- order entered March 1, 2011 noted that Mother "is in substantial compliance [with the permanency plan] but this significant progress is recent"; that "Mother needs to continue treatment, locate income and affordable housing"; and that "[Mother] has made a significant turnaround and is now working hard to regain custody of her children.  She understands that the 'clock is ticking' but has demonstrated that she is capable of achieving her goals."
- order entered December 1, 2011 noted that "Mother's housing is insecure and her income is unstable" and that "Mother has worked 3 days in the last 3 years and has no source of income other than the possibility of selling Avon.  She is pursuing a GED two mornings a week.  Her father assists her.  She has not paid child support consistently.  She is 35th on the list for a housing voucher.  She has completed substance abuse treatment but has not maintained aftercare or 12-step meetings.  She gave birth recently but hid her pregnancy from DCS and all other services providers."
- order entered May 22, 2013 states that Mother is "now in substantial compliance" and that "these children have been in foster care way too long and the parents are only now participating in all the required services.  The GAL objects to the finding of substantial compliance based, in part, on the mother's recent failed drug screen.  She admits use of marijuana about 2 months ago; denies any use of cocaine."
- order entered November 4, 2014 states that Mother "continues to pass random drug screens as well as hair follicle tests submitted on July 14 and September 12, 2014" and that she "has maintained appropriate housing at Ridgebrook and is in individual counseling."
- order entered August 26, 2015 states that Mother "is not in substantial compliance in that she has completed classes, but has not demonstrated that she can provide a safe and appropriate home for these children."

The observations in the orders are consistent with, and reflective of, the testimony at the

---

was not a ground of termination, the orders reviewing Mother's performance under the plans are relevant evidence of the ground of persistence of conditions.

trial.

Britney Bailey, a DCS Team Leader involved in this case from 2010 to 2014, testified that when she assumed responsibility for the case, Mother was noncompliant and had since had multiple positive drug screens; that Mother became compliant in 2011 and that DCS was able to begin trial home placements for the four children on a staggered basis at that time; that the children were removed as a result of the petition filed in June 2012; that Mother's compliance was "back and forth" in 2013 in that "she had completed tasks here and there but never completed the goals, had mostly positive screens and providers noted lack of motivation and consistency"; and that Mother "began to have progress again." Ms. Bailey testified further that Mother's drug screens were "typically positive" for cocaine and THC and that DCS had secured a three bedroom apartment, rent free, for Mother, but the children had not lived there since 2012.

Melcharle Thompson, the DCS case manager who assumed responsibility for the case after Ms. Bailey,[6] testified that Mother was compliant in July 2014 in that she was living in the apartment, passing drug screens, and undergoing counseling, and that, although Mother did not have a job, she felt that the older children could begin to return to Mother's home.
She testified further that Mother failed a drug screen in December 2014; that she learned that Mother was no longer living in the apartment but, rather, was living between her daughter's house and her mother's house; that Mother had been jailed two times since Ms. Thompson became involved with her case; and that Mother had not followed through on any employment referrals or suggestions from the Department of Vocational Rehabilitation.

The court made extensive findings regarding Mother's living situation, drug abuse treatment, employment, and efforts to receive counseling and training in parenting skills since the children were removed. Upon our review, these findings are supported by clear and convincing evidence and establish that the conditions which led to the children's removal persisted, along with other conditions preventing their safe return, within the meaning of Tenn. Code Ann. § 36-1-113(g)(3)(A).

## B. ABANDONMENT BY FAILURE TO SUPPORT

Tenn. Code Ann. § 36-1-113(g)(1) designates "abandonment," as defined at Tenn. Code Ann. § 36-1-102, as a ground for terminating parental rights. Tenn. Code Ann. § 36-1-102(1) defines the applicable terms:

---

[6] At that time four of Mother's children were in foster care, including Quadavon and Eric.

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians . . . have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

* * *

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i), (D).

In order to find "abandonment," there must be a "willful" failure to render support by the parent whose rights are being terminated. *See In re S.M.*, 149 S.W.3d 632 (Tenn. Ct. App. 2004). As found by the court in *In re S.M.*, "willfulness" in parental rights cases does not require the same standard of culpability required by the penal code nor does it require malevolence or ill will. *Id.* at 642. "Failure to pay support under the termination statutes is 'willful' if the parent 'is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.'" *State of Tenn., Dep't. of Children's Serv. v. Calabretta*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)).

In the order terminating Mother's parental rights, the court made the following finding relative to the ground of abandonment by failure to support:

12. Respondent is currently without a source of income and remains subject to arrest for failure to pay child support. Respondent has asserted that she is unable to work. While she certainly has some physical limitations, her claim of disability has been denied twice by Social Security and independently by the Child Support Division of this Court. She has never worked. She apparently has no intention of working or supporting her children. On February 19, 2014, following a hearing in this court where she was represented by counsel, she was ordered to pay $60 per month ongoing support for each of these children and $5 per month to reduce the more than $1,000 arrearage for each child. She ignored these orders completely and, as a result, was subject to arrest. She turned herself in on June 16, 2015, apparently expecting that she could just pay $50 on each

8

case and be released. Instead she remained in jail until her attorney arranged for her release upon a reduced cash bond of an additional $50 in each case. A review of her compliance was set to be heard on this same date but reset this morning when the Court became aware of the conflict. That review would have revealed that since her release she has contributed a total of ten dollars on Eric's account and absolutely nothing on Quadavon's account. She is not working with this Court's Child Support Employment and Parenting Program and has not followed through with referrals to Vocational Rehabilitation. According to her therapist, lack of income is one of her stressors. Her plan to address that issue is to rely on her mother and her adult children and to live off her father's disability income.

Mother concedes that DCS proved by clear and convincing evidence that Mother did not pay support within the four months preceding the filing of the petition; she argues, however, that other evidence offered by DCS demonstrated that Mother did not have the capacity to pay support and "absolutely" had a justifiable excuse not to do so. Citing testimony of the DCS case workers and counselors who expressed concerns about mother's health and identified services that Mother needed in order to maintain custody of the older children, Mother argues that she "was not capable of maintaining a job from which to pay child support and had a justifiable reason for her failure to pay support."

At the outset we note that Mother did not testify at the hearing and there is no proof that she was not capable of maintaining a job or that she had a justifiable reason for not paying support; the testimony of the DCS case workers and counselors relied upon by Mother in this regard was directed toward Mother's compliance with the requirements of the permanency plans, the ground of persistence of conditions, and the best interest of the children. With respect to the issue of willfulness, there was testimony that Mother's application for disability benefits had been denied by the Social Security Administration, which is evidence of her ability to work; there was also testimony that Mother failed to follow through on referrals for employment, that she was receiving financial support from her father, and that, when she was arrested for failure to pay support, she was able to secure sufficient funds to be released on bond. Given the facts in this case, the evidence is clear and convincing that Mother had the capacity to work or otherwise acquire funds to allow her to pay support in the four months preceding the filing of the petition and that she consciously did not do so; this failure was willful within the meaning of Tenn. Code Ann. § 36-1-102(1)(A)(i).

## C. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the

parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest.[7] The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't. of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in

---

[7] The factors at Tenn. Code Ann. § 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

In the order terminating Mother's parental rights, the court tracked the language of Tenn. Code Ann. § 36-1-113(i) and held:

1. Respondent has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home (wherever that may turn out to be) despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. Her circumstances are worse than ever. She has no home; she is refusing drug screens. She just can't get it together. Respondent has not maintained regular visitation or other contact with the children. She did not show up for the last two months, after missing visits while she was in jail. No meaningful relationship has otherwise been established between Respondent and the children. A change of caretakers and physical environment is likely to have a detrimental effect on the children's emotional and psychological condition. Respondent has shown neglect toward these children. She is without a healthy and safe physical environment to offer the children. We do not know whether she is continuing to abuse alcohol or controlled substances. We do know that she has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. 36-5-101.

2. Termination proceedings are pending against the children's father.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

4. The children are entitled to a safe, secure and loving home. They are thriving and "at home" in their current foster home, bonded to each other and to their foster parents. They have a chance to achieve permanency through adoption. They deserve to know where they will lay their heads at night. They should not have to rely on somebody who is unreliable, to depend on somebody who is undependable.

Related to that holding the court found:

22. These children have lived together in the same foster home since June 2012. They are certainly bonded to each other and to their foster parents. Eric has been there since he was only 6-1/2 months old. These are his psychological parents. Quadavon's wishes are well-known and have been for some time. . . . At one point foster parents were attempting to work with [Mother]. Their participation stopped after the incident in this courthouse where she was yelling and screaming and cursing them in front of the children.
* * *

24. Quadavon and Eric would be devastated by removing them from their foster parents to return them to their mother. They have no bond or attachment to her. And where would they go? Where would they sleep tonight? [Mother] has no home. She was evicted from the free residence the Department helped her get. She has no income. As far as this Court can tell, she has not worked more than a few days in her life. She has repeatedly been found able to work but chooses not to do so. Instead she's relying on other people's income and a 3-month financial bonanza, a plan that appears to be another burden that would interfere with her ability to care for her youngest children. What may have made sense for the older boys just does not make sense for the younger ones.[8]

Mother argues that evidence as to certain statutory factors weighs in her favor and, in effect, asks this court to reweigh the evidence; this we decline to do. Much of the evidence discussed *supra* with reference to persistence of conditions bears also on the best interest determination. In addition, there is substantial testimony regarding the needs of the children, particularly of Quadavon, as well as the effect a change in caretakers would have on them.[9] They are Mother's two youngest children and have been in foster care for most of their lives; the record shows that they are happy in their current placement. The court's factual findings and holding that termination of Mother's parental rights is in the best interest of Quadavon and Eric are supported by clear and convincing evidence.

---

[8] The court also made extensive best interest findings in its oral ruling at the conclusion of the trial.

[9] Ms. Dow, Quadavon's counselor, testified that she was working with him on issues relating to "adjustment disorder with anxiety" and "neglect and abuse of a child [with] focus on the victim"; that he is fearful of visits with his Mother and engages in tantrums and self-mutilation on occasion; and that he requires "a specialized parenting that can regulate [his] emotions. It's essential that that type of parenting is predictable, is consistent, routines and rituals. Looking back on his previous mental health treatment, back in 2010, he's exhibited these type of symptoms since then. And he's been able to be successful with specialized parenting."

## IV.  Conclusion

For the foregoing reasons, we affirm the judgment of the trial court terminating Mother's parental rights.

_____
RICHARD H. DINKINS, JUDGE